UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WING SHING PRODUCTS (BVI) LTD.,    }
                                   }
                Plaintiff,         }
                                   }    Civil Action: 01 CIV. 1044 (RJH)
        v.                         }
                                   }
SIMATELEX MANUFACTORY CO., LTD.,   }
                Defendant.         }

### DECLARATION OF HON KEUNG SIMON CHOI

1.      I, Hon Keung Simon Choi, am the Corporate Secretary and Legal Counsel of Simatelex Manufactory Company Limited ("Simatelex"), which is a Hong Kong corporation with its principal place of business in Hong Kong, at 9th Floor, Chaiwan Industrial Centre, 20 Lee Chung Street, Chai Wan, Hong Kong.  I am also a solicitor admitted in Hong Kong and England.

2.      I make this declaration on behalf of Simatelex, in support of Simaltelex's Motion to Dismiss.

3.      Since 1969, Simatelex has been in the business of manufacturing small household appliances and other similar products. Simatelex is a leading "original equipment manufacturer" - that is, a company that manufactures products for its customers, such as Sunbeam Product, Inc. ("Sunbeam"), under its customers' brand name(s) and according to its customers' specifications.

4.      From its beginnings in a small factory in Hong Kong, Simatelex has grown to three production plants and one tooling factory in China, with a work force of over 10,000 workers, and an output of over 20 million units annually.

5.      However, Simatelex does not transact business in New York or the United

States. It does not maintain a sales office or use a sales agent in New York or the United States, has no employees in New York, does not pay taxes in New York, and does not have real property or bank accounts in the State of New York.

6.      Simatelex's products are sold to its customers who are responsible for shipping the products from Hong Kong or Shenzhen, China, and for any distribution and marketing of such products. Simatelex does not advertise, ship or distribute its products in or to the United States. Simatelex does not make, use, offer to sell, or sell its products in the United States. Simatelex's products are delivered to a Hong Kong port or a Shenzhen port to shippers designated by Simatelex's customers. In general, Simatelex's accounts are credited by the bank upon proof of delivery to a Hong Kong port or a Shenzhen port.

7.      One of Simatelex's customers today is Sunbeam, for whom Simatelex manufactures directly to Subeam several products under the "Mr. Coffee" and "Sunbeam" brand names.[1] Simatelex has manufactured Mr. Coffee-branded products since 1987.

8.      It is my understanding that the plaintiff has alleged that Simatelex has infringed U.S. Design Patent No. 348,585 issued to John C.K. Sham (hereinafter, the "Sham Patent") on July 12, 1994, subsequently assigned to the plaintiff) "by its sales, and offers for sale of coffee makers to Sunbeam's corporate affiliates", and that Simatelex "actively induced Sunbeam" to infringe the Sham Patent.

9.      Neither I nor Simatelex were aware of the Sham Patent, or Wing Shing's purported ownership of it, until the filing of this Action, and Simatelex has never induced Sunbeam to infringe the Sham Patent.

---

[1] Prior to 1994, the Mr. Coffee brand was owned by a company of that name. In 1994, that company was acquired by Health-O-Meter, which was renamed "Signature Brands." Signature Brands was acquired by Sunbeam in 1998. For ease of reference, the term "Sunbeam" will be used herein to refer to Sunbeam and all of the relevant predecessors-in-interest.

10. In or about March, 1992, on information and belief, Sunbeam invited Simatelex to manufacture some models in the automatic drip, or "AD" series product line for Sunbeam. Based on the resulting discussions, in or about June 1993, Simatelex began to manufacture the AD12 model for Sunbeam, the first shipment of which was on or about July 5, 1993. Like most of the other Mr. Coffee products made for Sunbeam, the AD12 products were to be made according to designs and specifications provided to Simatelex by Sunbeam. These products were made at Simatelex's plants in China.

11. In or about July 1993, Simatelex was also asked by Sunbeam to produce the AD10 model coffee makers. The first shipment of that model for Simatelex was effected on or about August 15, 1993. These products were also made at Simatelex's plants in China.

12. Although the AD10 and AD12 had been manufactured by Simatelex since 1993, Simatelex did not begin manufacturing the AD4 model until 2000. On information and belief, the AD4 model, the remaining model in the AD series line, had been manufactured by Wing Shing until on or about March 13, 2000. Simatelex was asked to begin manufacturing the AD4 as well on or about March 13, 2000. On information and belief, Simatelex had been manufacturing a substantial percentage of the Sunbeam Mr. Coffee coffee makers, and most of the AD series coffee makers for the period prior to June 2003. All such manufacturing by Simatelex was conducted in China. Simatelex has ceased to manufacture all AD series coffee makers since mid June 2003 pursuant to a Memorandum Decision dated June 17, 2003 granted by Judge Arthur J. Gonzalez, a United States Bankruptcy Judge as informed by the plaintiff through its solicitors in Hong Kong.

13. Although there were prior agreements between the Sunbeam and Simatelex, the current relationship between the two companies is governed by a Supply Agreement dated February 21, 2000 (the "Sunbeam/Simatelex Contract"), as amended by a Supplementary

3

Agreement dated June 19, 2000, and a memorandum of agreement dated March 13, 2000. A true and correct copy of the Sunbeam/Simatelex Contract is attached hereto as Exhibit A; a true and correct copy of the Supplementary Agreement is attached hereto as Exhibit B, and; a true and correct copy of the memorandum of agreement is attached hereto as Exhibit C.

14. Throughout Simatelex's production of the AD series coffee makers, Simatelex believed that Sunbeam owned or had rights in all relevant intellectual property relating to the design and production of those models. This belief has a legitimate basis in the Sunbeam/Simatelex contractual relationship. In the Sunbeam/Simatelex Contract, the Supplementary Agreement and the memorandum of agreement, Sunbeam warranted and represented to Simatelex that both ownership of and responsibility for the relevant intellectual property associated with the coffee makers to be manufactured by Simaltelex were owned by Sunbeam. Specifically, Sunbeam expressly warranted and represented to Simatelex:

> Sunbeam warrants and represents that Sunbeam owns all patents, trademarks, service marks, copyrights, trade dress, mask works and any and all other intellectual property rights related to or residing in the Units or packaging (except for the intellectual property of (Simatelex) and that none of the Units infringes in any manner on the intellectual property rights of any other. (*See Exhibit A at paragraph 17(b).*

> For the [Model AD4], Sunbeam warrants and represents that it has or shall have all the right, whether intellectual or not, including but not limited to its tooling, to produce such products…(*See Exhibit B at paragraph 1)*

> Unless such intellectual property right are originated from [Simatelex], any and all existing patent rights for the Units or any of its component parts shall be the sole and exclusive property and/or responsibility of Sunbeam. In the event that Sunbeam and [Simatelex] jointly develop a patent-able item both parties agree to negotiate patent rights prior to applying for the patent. *(See Exhibit A at paragraph 18(b)(i).*

4

15.  Under the Sunbeam/Simatelex Contract, Simatelex was required to delivered the goods it manufactured "F.C.A."[2] to the port in Hong Kong. (*See Exhibit A at Part II, paragraph 7.a and Part I, paragraph 7*). Upon presentation of required documents showing delivery to the shipper, Sunbeam's bank authorizes payment, at which point title to the goods passes to Sunbeam in Hong Kong.

16.  It is Simatelex's customers, like Sunbeam, that establish and maintain distribution channels for the sale and distribution of their products to the U.S. and other countries.

17.  Thus, Simatelex does not have a "distribution channel" for its products, nor does it sell products in New York State, through intermediaries or otherwise. The products Simatelex manufactures are, to the extent they eventually arrive in the United States, the property of Simatelex's customers, not Simatelex. They bear the name, trademarks and packaging of Simatelex's customers, not Simatelex. And they are directed into one or more various states at the discretion of Simatelex's customers and their distributors, without any input by or control by Simatelex.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

<u>Simon Choi</u>
Hon Keung Simon Choi
Corporate Secretary & Legal Counsel of
Simatelex Manufactory Company Limited

Dated:  July 21, 2004

---

[2] FCA, or, "Free Carrier" is an INCOTERMS 2000 term which provides: "Title and risk pass to buyer including transportation and insurance cost when the seller delivers goods cleared for export to the carrier. Seller is obligated to load the goods on the Buyer's collecting vehicle; it is the Buyer's obligation to receive the Seller's arriving vehicle unloaded." INCOTERMS 2000, is the globally recognized international standard promulgated by the International Chamber of Commerce for the interpretation of trade terms in international sales.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Simon Choi*

Hon Keung Simon Choi
Corporate Secretary & Legal Counsel of
Simatelex Manufactory Company Limited

Dated: July 21, 2004

## SUPPLY AGREEMENT

### SUMMARY

SUPPLIER:               Name: Simatelex Manufactory Co., Ltd.
                               Address: 9/F., Chai Wan Industrial Centre, 20 Lee Chung Street,
                                     Chai Wan, Hong Kong.

                               Contact: Miss Yvonne Lam, Sales Director
                               Phone:   852-25156211
                               Fax:      852-25157911

PRODUCTS:     Mr. Coffee's Coffeemakers

PAYMENT TERM: Payment will be made via D/P at sight with shipping documents made available upon payment.

EFFECTIVE DATE:  upon date of counter-signing


THIS SUPPLY AGREEMENT ("Agreement") made this February 21, 2000 is between Sunbeam Products, Inc., a Delaware corporation ("Sunbeam"), and Simatelex Manufactory Co., Ltd. ("Supplier").

### PART I - VARIABLE TERMS AND CONDITIONS

The Variable Terms and Conditions supplement and modify the General Terms and Conditions (Part II).  Capitalized words shall have the meanings given below in Part II.

1.      The Units provided by Supplier shall meet the following Board Standards (where applicable): Underwriters' Laboratories ("U.L.") and all U.S. federal, state and local governmental requirements, including applicable Food and Drug Administration ("FDA") regulations for Units to be sold in the United States; Canadian Standards Association ("CSA") and all Canadian federal, provincial and local governmental requirements, including applicable Health Canada regulations for Units to be sold in Canada, as such may be changed from time to time.  A Sunbeam Product Specification and Quality Assurance Standard will be provided under separate cover.

2.      The number of Samples to be delivered by Supplier (under Paragraph 2(b) of Part II) shall be: 24/ model

3.      The number of Units contained in each master shipping carton (under Paragraph 3(a) of Part II) shall be: Two (should be varied from product to product).

4.      The expense of fabricating the printing plates and dies necessary for printing the graphics for the packaging and enclosures of the Units (under Paragraph 3(b) of Part II) shall be borne by:  Supplier.

5.      All costs and expenses associated with listing the Units with the Boards set forth above shall be borne by: Sunbeam.

6.      The projected quantity of Units to be purchased by Sunbeam shall be 3 million units per year.  The total amount of Units to be purchased by Sunbeam will vary with market conditions.

7.      The FCA point (Incoterms 1990) to which Supplier shall deliver Units (under Paragraph 7(a) of Part II) shall be at Hong Kong.



EXHIBIT
A

8.    The prices for Units and Additional Units (under Paragraph 8 of Part II) are listed as below:

| | Customer Model # | New Price FCA HK without Coupon Effective June 1, 2000 | Price FCA HK with Coupon Included at @US$0.01 Effective June 1, 2000 |
|---|---|---|---|
| | | US$ | US$ |
| | **Coffeemaker Series** | | |
| 1 | AD4 | 6.98 | 6.99 |
| 2 | AD10 | 8.34 | 8.35 |
| 3 | AD12 | 8.51 | 8.52 |
| 4 | AD12-2 | 8.55 | 8.56 |
| 5 | AD12PC | 8.53 | 8.54 |
| 6 | AD12BP | 9.31 | 9.32 |
| 7 | ADS10 | 10.07 | 10.08 |
| 8 | ADS12 | 10.26 | 10.27 |
| 9 | ADX20 | 12.78 | 12.79 |
| 10 | ADX20-2 | 12.82 | 12.83 |
| 11 | ADX23 | 12.93 | 12.94 |
| 12 | BL110 | 8.02 | 8.03 |
| 13 | BL113 | 8.16 | 8.17 |
| 14 | BL4 | 6.52 | 6.53 |
| 15 | BL4PC | 6.52 | 6.53 |
| 16 | BL4TK | 8.87 | 8.88 |
| 17 | BL5 | 6.52 | 6.53 |
| 18 | BL5TK | 7.70 | 7.71 |
| 19 | BL6 | 6.62 | 6.63 |
| 20 | BLX210 | 11.98 | 11.99 |
| 21 | BLX213 | 12.12 | 12.13 |
| 22 | HCB50 | 10.97 | 10.98 |
| 23 | HCB50X | 13.71 | 13.72 |
| 24 | HCB63 | 11.27 | 11.28 |
| 25 | HCB63X | 13.86 | 13.87 |
| 26 | JR40 | 9.17 | 9.18 |
| 27 | MCC120 | 9.50 | 9.51 |

| | Customer Model # | New Price FCA HK without Coupon Effective June 1, 2000 | Price FCA HK with Coupon Included at @US$0.01 Effective June 1, 2000 |
|---|---|---|---|
| | | US$ | US$ |
| 28 | MP12 | 9.34 | 9.35 |
| 29 | MP13 | 9.46 | 9.47 |
| 30 | MPS12 | 10.98 | 10.99 |
| 31 | MPS12PF | 11.97 | 11.98 |
| 32 | MPS13 | 11.12 | 11.13 |
| 33 | MPS13PF | 12.11 | 12.12 |
| 34 | MPX20 | 13.26 | 13.27 |
| 35 | MPX23 | 13.39 | 13.40 |
| 36 | MPX30 | 15.76 | 15.77 |
| 37 | MPX30GTF | 17.39 | 17.40 |
| 38 | MPX33 | 15.91 | 15.92 |
| 39 | MPX33GTF | 17.53 | 17.54 |
| 40 | NL4 | 7.52 | 7.53 |
| 41 | NL12 | 10.14 | 10.15 |
| 42 | NL12D (w/ #6658 GTF) | 11.79 | 11.80 |
| 43 | NLS12 | 12.13 | 12.14 |
| 44 | NLS13 | 12.28 | 12.29 |
| 45 | NL13 | 10.29 | 10.30 |
| 46 | NL13D (w/ #6658 GTF) | 11.94 | 11.95 |
| 47 | NLX20 | 14.47 | 14.48 |
| 48 | NLX20D | 16.14 | 16.15 |
| 49 | NLX23 | 14.62 | 14.63 |
| 50 | NLX23D | 16.29 | 16.30 |
| 51 | NLX23GTF | 16.26 | 16.27 |
| 52 | NLX30GPC | 18.34 | 18.35 |
| 53 | NLX33GPC | 18.48 | 18.49 |
| 54 | PR14 | 9.26 | 9.27 |
| 55 | PR15 | 9.14 | 9.15 |
| 56 | PR16 | 9.16 | 9.17 |
| 57 | PR17 | 9.28 | 9.29 |
| 58 | PR5 | 7.92 | 7.93 |
| 59 | PR5D | 7.92 | 7.93 |
| 60 | PR5TK | 10.43 | 10.44 |
| 61 | PR6 | 8.14 | 8.15 |
| 62 | PR6D | 8.27 | 8.28 |

| | Customer Model # | New Price FCA HK without Coupon Effective June 1, 2000 | Price FCA HK With Coupon Included at @US$0.01 Effective June 1, 2000 |
|---|---|---|---|
| | | US$ | US$ |
| 63 | PRX20 | 13.00 | 13.01 |
| 64 | PRX20GTF | 14.69 | 14.70 |
| 65 | PRX23 | 13.13 | 13.14 |
| 66 | PRX23GTF | 14.82 | 14.83 |
| 67 | PRX30 | 15.60 | 15.61 |
| 68 | PRX30 w/ Worldtronic timer | 15.60 | 15.61 |
| 69 | PRX30D | 15.60 | 15.61 |
| 70 | PRX30GTF | 17.23 | 17.24 |
| 71 | PRX30GTF w/ Worldtronics timer | 17.23 | 17.24 |
| 72 | PRX33 | 15.74 | 15.75 |
| 73 | PRX33 w/ Worldtronic timer | 15.74 | 15.75 |
| 74 | PRX33GTF | 17.37 | 17.38 |
| 75 | PRX33GTF w/ Worldtronics timer | 17.37 | 17.38 |
| 76 | TR4.1 | 6.40 | 6.41 |
| 77 | TR4.1 (6-pack ctn; plain brown box) | 6.24 | 6.25 |
| 78 | TR4.1 (8-pack ctn; plain brown box) | 6.22 | 6.23 |
| 79 | TR40.1 | 9.26 | 9.27 |
| 80 | UTC403 | 19.49 | 19.50 |
| 81 | VL4 | 6.41 | 6.42 |

All FCA prices will remain firm through March 31, 2001 unless modified by mutual written agreement signed by the parties.

9.    The expense of purchasing or fabricating the Tooling (under Paragraph 14 of Part II) shall be borne by Sunbeam. The design of the Units ("Design") shall be owned by Sunbeam unless provided by Supplier.

10.    In the event that Sunbeam will bear expenses for purchasing or fabricating Tooling (under Paragraph 14(b) of Part II), Sunbeam shall in no event be required to reimburse Supplier in excess of the amount specified.

11.    This is an exclusive agreement for worldwide exclusivity under Paragraph 11 of Part II.

4

12.     Supplier shall bear the cost of service, repair or replacement of Units that are identified as defective in material or workmanship. Supplier agrees to warrant the product (in accordance with paragraph 17a) for a period of (18) months from the date of manufacture as evidenced from the date code. This warranty applies to any and all Units returned because of defects in material, workmanship or design (if Supplier designed the Units). Sunbeam may direct Supplier to replace defective Units, on a 1:1 ratio (one replacement Unit for each defective Unit), and to pay for or reimburse Sunbeam for any transportation costs, import charges, and handling associated with this warranty coverage. It is agreed that the return of the defective products shall be in full container quantity and Supplier may choose to pay the replacement costs in lieu of replacement. Sunbeam should from time to time furnish a detailed report, showing that such Units are of manufacturing defects or poor workmanship.

13.     Any failure rate in excess of the following shall be deemed to be an epidemic (under Paragraph 16(b) of Part II):  5%

14.     Supplier agrees to make available replacement assemblies and/or parts to Sunbeam for a period of seven years (under Paragraph 16(c) of Part II) from the date of last delivery of Units (in terms of particular product basis) to Sunbeam. Within ninety days prior to the close of said 7 years period, Sunbeam may place a final order for replacement assemblies and/or parts in bulk.

15.     All notices given by either party hereunder to the other party shall be addressed as follows:

If to Sunbeam:

Sunbeam Products, Inc.
2381 Executive Center Drive,
Boca Raton, FL 33431,
U.S.A.
Attn: Vice President – Global Sourcing Operations

If to Supplier:
Simatelex Manufactory Co., Ltd.
9/F., Chai Wan Industrial Centre, 20 Lee Chung Street,
Chai Wan, Hong Kong.
Attn: Yvonne Lam – Sales Director

## PART II - GENERAL TERMS AND CONDITIONS

Sunbeam owns or has the right to utilize certain patents, patent applications, designs, copyrights, trademarks, technical and other proprietary information relating to the products which are the subject of this Agreement. Sunbeam is willing to purchase such products from Supplier on an exclusive basis and, Supplier is willing to manufacture for and sell to Sunbeam for distribution one or more models of the products identified in the Summary, each of which is referred to herein as a Unit or Units, depending upon the numbers of models. The Unit(s) are presently referred to by the following model name or model numbers: Brewers ( Coffeemakers ) and the model numbers as specified in Paragraph 8 of Part I. ( These model names and numbers may be changed by Sunbeam at a later date and from time to time. )

1.               Manufacture/Purchase

Supplier agrees to manufacture and Sunbeam agrees to purchase the Units. Sunbeam will provide an estimate of its expected purchases of Units in the form of a rolling six-month forecast ("Rolling Forecast"). Sunbeam will provide this Rolling Forecast monthly to Supplier.   If the Supplier does not receive a Rolling Forecast it shall promptly notify Sunbeam before purchasing any material or performing any work in accordance with this Article.  Sunbeam will commit, as defined herein, to the long-lead material to the Units ("Long-Lead Material") relating to the Rolling Forecast.  Supplier agrees to supply Sunbeam with a list of what items deemed to be Long-Lead Material and their respective line item costs before making any purchases, for Sunbeam's written approval. The Supplier will keep in sub-assembly form, the first month of Rolling Forecast. Sunbeam will provide purchase orders a minimum of six weeks prior to requested ship date. If the Long-Lead Material and sub-assemblies that

5


EXHIBIT
A

have been purchased and/or built in accordance with this Article have not been consumed by a Sunbeam Purchase Order, Sunbeam will purchase the Long-Lead Material and sub-assemblies at a price equal to the actual and direct cost of such items.

2.        Specifications

a.        The Units shall strictly conform to Attachment A (if any) and will be manufactured so as to meet the Board Standards and other requirements referenced above in Paragraph 1 of Part I.    Additionally, Supplier shall comply with Sunbeam's Supplier Quality Policy Manual SQ – 101 ("Quality Manual") which is hereby incorporated by reference. Any subsequent revision to such Quality Manual in effect at the time this Agreement is entered into shall be deemed the applicable manual.

b.        Supplier will provide samples of each model Unit, replacement parts, accessory items and its packaging ("Samples") in accordance with the Production Part Approval Process set out in the Quality Manual in the quantities set forth in Paragraph 2 of Part I.  Samples shall be produced from Production Tooling and must satisfy the Board Standards and in all respects conform to the specifications for Units.  The Samples will be inspected by Sunbeam and Supplier will be advised of changes, which need to be made before production, and/or packaging of Units may be commenced.  The Supplier will provide a list of service parts if requested by Sunbeam.  The final approved Samples shall supplement the specifications to which the Units shall strictly conform.

c.        Supplier shall not knowingly supply Units or packaging to Sunbeam that contain mercury, natural rubber latex or dry natural rubber.  If Supplier intends to supply Units and/or packaging containing such substances, Supplier must receive the written authorization from Sunbeam before the Samples (as defined herein) are delivered to Sunbeam.

3.        Packaging, Enclosures and Marking Specifications

a.        Each Unit will be individually packaged. The number of individually packaged Units placed in each master carton shall be as specified in Paragraph 3 of Part I.  Supplier shall package master cartons of Units so that they withstand the mode of transportation selected by Sunbeam for each shipment without damage.   The packaging must satisfy packaging requirements specified in Attachment A.

b.        The party designated in Paragraph 4 of Part I will bear the expenses of the purchase of the printing plates and dies required to print and fabricate the packaging.

c.        Each Unit and its packaging shall bear an appropriate country of origin legend and the appropriate trademark notice (® or ™) adjacent any Sunbeam registered or common law trademark used.

4.        Inspection

Based upon its inspection and testing at its ultimate destination, Sunbeam may, reject any shipment or part thereof which in the discretion of Sunbeam does not meet all of the standards and specifications referred to in Paragraph 1 of Part I, the packaging requirements of Paragraph 3 of Part II, the quality control requirements of Paragraph 10 of Part II, or any other term and condition of this Agreement.  Sunbeam shall not be deemed to have accepted any shipment of Units and Sunbeam shall be entitled to a refund of the purchase price (including the cost of transporting the Units from the F.O.B. points specified in Paragraph 7(a) of Part II to the point of Sunbeam's final inspection) paid for any shipment of Units which shall fail to meet the standards and specifications and quality control requirements.

5.        Board Standards

Supplier will, charge at actual cost to Sunbeam, offer assistance, provide samples and make any changes to Tooling so the Units will meet the various Board Standards listed in Paragraph 1 of Part I.  Sunbeam will not be required to pay for any Units until and unless they conform and continue to conform to the Board Standards.

6.        Quantity to Be Purchased

a.        Sunbeam may order Units in addition to the number specified in Paragraph 6 of Part I ("Additional Units").

b.        Units and Additional Units shall be ordered using Sunbeam's standard form of purchase order bearing a

6

notation which refers to this Agreement. Such purchase order(s) shall specify the number of Units ordered, the delivery schedule and the ultimate shipping destination. Sunbeam will provide Supplier with a minimum of two months lead time for delivery of Additional Units to the ultimate destination designated by Sunbeam provided that a committed 6-month rolling forecast (including Units and Additional Units in question) shall be made available to supplier beforehand and Supplier shall rely on such 6- month rolling forecast to procure materials. Upon receiving the change of rolling forecast by Supplier, Supplier shall endeavour to manufacture such Units and Additional Units based on the existing tooling capacity and material available.

7.          Shipment, Delivery and Title

          a.          The Units are to be delivered F.C.A. to the point specified in Paragraph 7 of Part I. Sunbeam retains the right to modify any delivery schedule previously designated in any purchase order delivered to Supplier provided that such right to modify any delivery schedule of purchase order shall not be exercised unless (30) days prior written notice has been given to Supplier. Upon receiving the change of rolling forecast by Supplier, Supplier shall endeavour to manufacture such Units and Additional Units based on the existing tooling capacity and material available. Time is of the essence as to Supplier's performance hereunder.

          b.          If all or any portion of an order is not delivered on the delivery date(s) specified in the relevant purchase order, Sunbeam should give an additional 10 days grace period for the Supplier to deliver such order. In the event that Supplier could not deliver such an order after expiry of such 10 days, Sunbeam may (without limiting or waiving its right to assert any other remedies available at law) exercise one or more of the following options:

          i.          Cancel the undelivered portion of any order;

          ii.          Require Supplier to ship the order via premium means (such as air freight, including overnight air freight) at Supplier's expense; or

          iii.          Require Supplier to discount the pricing on the undelivered portion of the order.

8.          Pricing

          The price for Units and/or Additional Units shall remain firm throughout the life of this Agreement unless otherwise specified in Paragraph 8 of Part I.

          Payment shall be made via D/P at sight.

9.          Currency

          All payments between the parties shall be made in U.S. dollars.

10.          Quality Assurance

          a.          Supplier agrees that the Units shall be acceptable to Sunbeam as to designs, specifications, standards of quality, and performance. Additionally, the Units shall meet or exceed the minimum acceptable quality level as set out in the Quality Manual. No significant deviation from designs, specifications, or standards of quality established by Sunbeam shall be made without the written consent of Sunbeam. Supplier agrees that it will establish and maintain appropriate test and inspection procedures to insure compliance with this paragraph. For example, Supplier shall perform quality assurance sampling in accordance with the Quality Manual.

          b.          Supplier agrees to maintain, and provide copies to Sunbeam if requested, test data documentation that shall accurately measure and ensure compliance with critical dimensions, material composition, and other critical requirements as specified herein.

11.          Exclusivity

          Unless with the consent from Sunbeam, Supplier shall not sell Units to any third party under a trade name, trademark, or other proprietary name or symbol, which is owned or licensed to said third party, it being the intention of the parties that Supplier shall not, during the term of this Agreement, manufacture or sell any Units, including "private labeled" Units, to any



third parties.

12.        Right of Inspection

Upon prior notice, Supplier agrees to allow Sunbeam's representatives or their authorized agents at any and all times during regular business hours to enter Supplier's premises to inspect the premises, the manufactured Units, and the means for manufacturing the same, including all documentation related to the Units, including but not limited to, facility procedures, and all other records related to the quality system.

13.        Obligation Not to Subcontract

a.        Supplier agrees that it will perform all manufacturing and assembly operations itself to produce the Units, and that it will not subcontract the complete or substantially complete manufacture or assembly of the Units unless Supplier obtains Sunbeam's prior written approval.

b.        The subcontracting of any work hereunder, if permitted by Sunbeam, shall not relieve Supplier from its obligations hereunder.

14.        Sunbeam Tooling

a.        Regarding all new tooling, the tools, dies, molds and fixtures ("Tools" or "Tooling") required by Supplier to manufacture the Units shall be purchased or fabricated by Supplier at the expense of the party designated in Paragraph 9 of Part I. The minimum useful life of such Tooling shall allow for the manufacture of the total number of Units to be purchased (fair, wear and tear excepted) hereunder. Supplier shall provide Sunbeam with a list of the Tooling as well as a drawing of each such Tool.

b.        If Tooling is to be paid for by Sunbeam, Supplier shall not charge Sunbeam more than Supplier's actual Tooling costs and will bear the expense of Tooling in excess of the amount specified in Paragraph 10 of Part I. Sunbeam will pay for such Tooling costs in the manner and at the times set forth in Paragraph 10 of Part I.

c.        Tools paid for by Sunbeam shall be the property of Sunbeam. For normal production maintenance of tooling, Supplier shall maintain and repair Sunbeam's Tooling at no cost to Sunbeam. Upon written demand, the Tools shall, at Sunbeam's option, be either promptly destroyed or shipped in accordance with Sunbeam's instructions. Sunbeam shall reimburse Supplier for its reasonable costs of destruction (less any scrap value realized by Supplier) or shipping.

d.        If Sunbeam rejects the first shipment of production Units because of a problem attributable to defects in the Tooling and Supplier is unable to correct such defects within a reasonable time not to exceed sixty (60) days, Supplier shall be required to purchase the Tooling from Sunbeam at a price equal to all payments made by Sunbeam in respect of such Tooling.

e.        Unless with the written consent of Sunbeam, Supplier shall not use any Tools paid for or to be paid for by Sunbeam for any purpose other than the manufacture of Units to be sold to Sunbeam hereunder.

15.        Sunbeam Packaging

In the event that Sunbeam provides the packaging for Units, Supplier agrees that it will not use Sunbeam packaging in any manner except in connection with the manufacture of the product covered by this Agreement. Further, Sunbeam has no obligation to mark such packages with information concerning Supplier's intellectual property rights.

8



16.        Service Replacement Parts/Epidemic

a.        An "Epidemic" shall mean: If the Units or any particular model line of the Units become subject to an epidemic or broad series of product failures, as evidenced by a failure rate(s) in excess of that specified in Paragraph 12 of Part I or as reasonably determined by Sunbeam ("Epidemic"), Supplier shall at its own cost and expense, including necessary shipping charges, provide Sunbeam, Sunbeam's customers or consumers with a new and unused and properly functioning Unit for each and every Unit (all Units, not simply defective Units) manufactured during the period of time which is relevant to the defect or Epidemic. Supplier shall indemnify, defend and hold Sunbeam and its customers harmless from any and all costs and expenses, including claims, suits or other manner of governmental or private actions relating to or arising from an Epidemic, including but without limitation the costs of performing a recall and penalties assessed by customers of Sunbeam. For the purpose of this Paragraph 16(a), the terms "fail" or "failure" refer to any Unit or mechanical part thereof which is not of good and merchantable quality and free from defects in material and workmanship and the term "failure rate" refers to the ratio of the number of Units which failed compared to the total number of Units which at any time during the life of the Agreement have been sold at the retail level. An Epidemic shall also be deemed to exist if any significant number of Units shall: (1) contain one or more defects which create a substantial product hazard within the meaning of the Consumer Product Safety Act of the United States or any comparable law of any State of the United States or country or subdivision thereof in which Units are used, (2) fail to comply with the requirements of the Food, Drug and Cosmetic Act or any comparable law of any State of the United States or country or subdivision thereof to which the Units are shipped, or (3) fail to comply with the requirements of this Agreement. The paragraph shall survive during the warranty period of the Units (in terms of particular product basis).

b.        After the final shipment of Units and Additional Units hereunder, Supplier shall, for the period of time specified in Paragraph 13 of Part I, supply replacement assemblies and/or parts to Sunbeam upon request and shall not discontinue the manufacture thereof without Sunbeam's prior approval. The price for such replacement assemblies or parts shall be negotiated in good faith by the parties hereto, but shall in any event generally conform to the pricing applicable to the final shipment of Units or Additional Units hereunder.

c.        Supplier shall provide a list of such replacement assemblies and/or parts, directions for the applicable repair process, list of jigs or tools that are required and a Supplier's price for such jigs or tools or a list of alternative suppliers for such items. Supplier shall also provide a list of such replacement assemblies and/or parts, with Supplier's purchase lead-time, cost (in accordance with paragraph 16 (b) above) and exploded diagram of the Unit with repair parts referenced. Supplier agrees that the lead-time for replacement assemblies and/or parts shall not exceed sixty (60) days provided that such Units are on production line.

17.        Product Warranty

a.        Supplier warrants that the Units shall be of good and merchantable quality, free from defects in material and workmanship (and design if the Design is owned by Supplier), strictly conform to the specifications and standards of Paragraph 1 of Part I and pass Quality Control inspection and testing. If Supplier has not met the requirements of this paragraph by acting in a manner that amounts to gross negligence or willful misconduct, Sunbeam, without limiting its rights, may immediately terminate this Agreement and recover any and all damages Sunbeam suffers from Supplier.

b.        Sunbeam warrants and represents that Sunbeam owns all patents, trademarks, service marks, copyrights, trade dress, mask works and any and all other intellectual property rights related to or residing in the Units or packaging (except for the intellectual property of Supplier) and that none of the Units infringes in any manner on the intellectual property rights of any other. Supplier warrants and represents that to the best of its knowledge its manufacturing techniques do not employ any unlicensed process that is claimed in a valid and subsisting United States patent. Further, Supplier warrants that to the best of its knowledge any components it may use in manufacturing the Units do not infringe any U.S. patents, copyrights, trademarks or other intellectual property rights.

c.        Supplier warrants that all Units supplied hereunder shall be free and clear of all liens and other adverse claim against title and possession.





18.        Indemnity and Insurance

a.        Indemnification

Supplier and all its wholly-owned or controlled subsidiaries agree to protect, hold harmless, defend and indemnify, at its own expense Sunbeam and its customers from and against all reasonable and direct liability, costs and expense arising out of the death or injury to any person, or damage to property, by whosoever suffered, resulting, or claimed to have resulted from any purchase, sale, use or operation of any unit furnished hereunder, solely due to defects and/or negligence in the total design originated by Supplier and manufacturing process including but not limited to components and workmanship. Sunbeam shall promptly notify Supplier in writing of any such claim or lawsuit.

Pursuant to this indemnification, Supplier shall, at its own cost and expense, buy and maintain written by an insurer acceptable to Sunbeam and with a broad form vendors and contract liability endorsements, with personal injury and property damage limit per occurrence of three million US dollars (US$3,000,000), and naming Sunbeam as an additional insured. All coverage there under shall not be terminated or changed unless approved in writing by Sunbeam with a minimum of thirty(30) days written notice. Evidence of such insurance shall be submitted to Sunbeam prior to delivery of any Units.

b.        Patents, Trademarks and other conditions relating to intellectual property rights



i)    Unless such intellectual property right are originated from Supplier, any and all existing patent rights for the Units or any of its component parts shall be the sole and exclusive property and/or responsibility of Sunbeam. In the event that Sunbeam and Supplier jointly develop a patent-able item both parties agree to negotiate patent rights prior to applying for the patent. (Supplier is exempted from patent liability concerns relating to coffee maker timer module, Sunbeam part #6404, regarding Worldtronics International patents held on auto lock-out feature.)

ii)    Supplier shall affix to the Units existing trademarks, trade names, copyrighted names and other identifying symbols strictly in accordance with Sunbeam instructions and in no other manner. All such trademarks, trade names, identifying symbols or copyrighted  names relating to the Units shall at all times remain the property of Sunbeam, and Supplier shall not at any time acquire any rights thereto. It is understood that this Agreement is not to be construed as a license to Supplier to use the trademarks, trade names, copyrighted names and identifying symbols as described herein and same shall not be used in connection with any goods other than those produced for and sold to Sunbeam pursuant to the terms of this Agreement.

iii)    In the event of a termination of commercial relations beteween the parties hereto and/or cancellation or termination of this Agreement for any reason whatsoever, Supplier shall not thereafter make, use, exercise or sell any Units bearing any trademark of symbol of Sunbeam or any colorable limitation thereof, and shall promptly return to Sunbeam all design drawings, tool drawings and tooling.

iv)    Supplier acknowledges that it would be damaging to Sunbeam to an irreparable degree if Supplier or any other customer of Supplier were to sell any Units which are identical or closely similar to aesthetic visual design to the Units supplied to Sunbeam or an appliance using the same of similar confidential design features. Therefore, Supplier agrees that for and during the period in which shipments are to be made under the terms of this Agreement and for a period of two (2) years thereafter, it will not ship any item embodying the aesthetic visual design or any design similar to the Units. Unless Supplier also agrees that it will not at any time use Sunbeam's property in the production of any other appliances, coffee maker or otherwise.

19.        ODC Labeling

Supplier represents and warrants that it does not use ozone depleting chemicals ("ODCs") in its manufacturing processes for the Units and that the Units will not need to be labeled pursuant to the provisions of Section 611 of the Clean Air Act Amendments of 1990 ("Section 611") of the United States of America. Supplier represents that it is familiar with the requirements of Section 611 and understands that Sunbeam would not enter into any agreement to purchase the Products from Supplier if the Units were manufactured with ODCs or with manufacturing processes that make use of ODCs.

10



20.        Compliance with Labor Laws

If the Supplier is a company subject to the United States Fair Labor Standards Act ("FLSA") the Supplier represents and warrants that it is aware of the provisions of the FLSA concerning minimum wage, overtime, and child labor provisions, and further warrants that it will comply with such standards and will not employ oppressive child labor or engage in oppressive industrial home work or any other violation of FLSA in connection with the manufacture of Units.  If the Supplier is not a company subject to the FLSA, the Supplier warrants that to the best of its knowledge it will comply with applicable child labor laws and, notwithstanding the foregoing, in no event will Supplier employ oppressive child labor or engage in oppressive industrial home work in connection with the manufacture of the Units.  In the event that Sunbeam gives permission to subcontract, Supplier warrants that it will not hire any subcontractor that does not comply with the foregoing provisions. Sunbeam reserves the right to reject or return any Units not in compliance with the foregoing and to charge Supplier for any and all costs, expenses and/or losses in connection with such rejection or return.

Sunbeam reserves the right to investigate any potential violation of law or this provision and, at its discretion, to suspend, discontinue or terminate its relationship with any Supplier for its failure to comply with any laws applicable to merchandise produced in the United States or any other country, or this provision.   This right to investigate includes, but is not limited to the right of Sunbeam, or its representatives, to inspect, with prior notice, Supplier's manufacturing facilities to ensure compliance with this Article 20.    Additionally, Sunbeam shall have the right to treat any Units not in compliance with the foregoing and to charge Sunbeam for any and all costs, expenses and/or losses in connection with such rejection or return.

21.        Full Cooperation

Supplier will provide assistance to Sunbeam in responding to any inquiry or observation from any governmental agency or Board Standards organization, and will promptly investigate and respond to any allegation the Unit is improperly designed or has failed to perform properly.

22.        Restrictions of Trademark and Design

a.        Supplier acknowledges that Sunbeam or its subsidiaries is the owner of all rights in any and all trade names and trademarks, including SUNBEAM, and the brand names or model names which may be applied to the Units or which Sunbeam may notify Supplier of in the future ("Trademarks") and that Sunbeam has the exclusive right to use the Trademarks or any confusingly similar trade names or trademarks. Supplier will not use the Trademarks or any confusingly similar trade names or trademarks in any manner except as specified herein and will not use the Trademarks or any confusingly similar trade names or trademarks on or in connection with any goods other than those specifically covered by this Agreement.  Supplier will supply only to Sunbeam goods bearing the Trademarks or any confusingly similar trade names or trademarks.  Upon termination of this Agreement for any cause, Supplier will immediately cease any and all use of the Trademarks or any confusingly similar trade name or trademark, and thereafter will not manufacture and sell or enter into any agreement with any third party to manufacture or supply goods under the Trademarks or any confusingly similar trade names or trademarks.

b.        Sunbeam shall have the exclusive right to the trade dress, visual design, and copyrights in the non-functional aspects of the Units and packaging covered by the Agreement.  Supplier agrees that it will not manufacture or sell any goods which are the same, similar to, or likely to be confused with the trade dress, product configuration, visual design, or copyrighted aspects of the Units except under the terms of this Agreement. Supplier agrees not to use or allow the Tooling to be utilized in the manufacture of any goods which embody the same, similar, or likely to be confused trade dress, visual design or copyrighted aspects as the Units except as expressly approved in writing by Sunbeam.

11



c.    The owner of the design of the Units is specified in Part 1, Paragraph 9. Any inventions, innovations, designs, plans, specifications, drawings, materials, components or the like supplied by or on behalf of Sunbeam shall remain property of Sunbeam and Supplier shall have no rights, property or interest in same and at any time upon demand by Sunbeam shall return such items to Sunbeam or make such other disposition as Sunbeam shall direct. For design of the Units initiated by Sunbeam, Supplier hereby irreversibly assigns any and all rights it may have or acquire in such items (including but not limited to rights to improvements or changes), at law or in equity, if any to Sunbeam. Without limiting Article 23 below, Supplier shall keep such items in confidence and shall return such items upon termination or expiration of this Agreement.

23.        Preservation of Confidential Information and Know-How

a.    Supplier acknowledges that it may be receiving from Sunbeam confidential information and materials, and also manufacturing know-how, including knowledge of methods and processes, detailed manufacturing data, and specifications. Supplier agrees that it will keep such information and know-how in confidence. Supplier agrees not to use such materials, information, or know-how for its own benefit, nor to disclose such information or know-how to third parties, nor to use any information or know-how for operations not connected with production of Units under this agreement. Supplier's officers and employees who have a need to know shall be allowed access to Sunbeam information and/or know-how. Sunbeam's confidential information shall be maintained in a safe place. Excluded from this paragraph is any information or know-how that:

i.    can be demonstrated to have been in the public domain prior to the date of this agreement;

ii.    can be demonstrated to have been in possession prior to the date hereof by virtue of some source other than Sunbeam;

iii.    becomes part of the public domain through a means that is not due to any action on Supplier's part;

iv.    is provided to Supplier by a third party as a matter of right.

v.    is used with the express permission in writing of Sunbeam; or

vi.    is disclosed under compulsion of law, judicial or administrative directives by competent authorities; or

vii.    is generated independently by Supplier without use of any of the information

(b)    At the termination of this agreement, if requested by Sunbeam, Supplier shall return all confidential information to Sunbeam or destroy all confidential information and certify that destruction; in either event, no copies whatsoever of materials containing any confidential information shall be retained by Supplier.

24.        Termination

This Agreement shall be terminable immediately, upon written notice by one party (the "Terminating Party") to the other as set forth below:

a.    If the other party (the "Non-Terminating Party") institutes proceeding seeking relief under a bankruptcy code or similar law, or consents to the filing against if of any petition for the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official), or permits any such proceeding to remain undismissed for a period of forty five (45) days or more, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due, or takes any action in furtherance of the foregoing;

b.    Upon any material default by the Non-Terminating Party under this Supply Agreement, if said default is or cannot be cured by the defaulting party within thirty (30) days of receipt of written notice from the Terminating Party of the default, or such longer period of time, if agreed between the parties, except as otherwise specified herein.

25.        Assignments

This Agreement may not be assigned by either party without the written consent of the other; provided, however, that

this Agreement may be assigned by Sunbeam to any affiliated corporation or to any successor of substantially all of its assets or its household appliance business without the consent of Supplier.

26.        Effects of Termination

In the event that this Agreement is terminated due to the default of a party, in addition to all rights it has under this Agreement, the non-defaulting party shall have the right to exercise any and all remedies available at law or in equity. All rights and remedies are cumulative and the election of one remedy shall not preclude another. Any termination shall be without prejudice to accrued rights. Specifically, a termination due to default or delivery of all the Units required hereunder shall not in any manner affect or terminate the rights and obligations of the parties hereto which have accrued hereunder prior or subsequent to such delivery, and specifically, without limitation, the rights and obligations of the parties relative to payment, warranties, parts and indemnities. Notwithstanding the expiration or termination of this Agreement, the obligations intended to survive termination or expiration of this Agreement (§16 Replacement Parts/Epidemic, §17 Product Warranty; §18 Indemnity and Insurance; §21 Full Cooperation; § Preservation of Confidential Information and Know-How) shall continue in full force and effect.

27.        Severability

Any portion of this Agreement, which is prohibited by the laws of any country or state, shall, as to said jurisdiction, be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

28.        Waiver

The failure or delay of either party to enforce, at any time or for any period of time, any provision of this Agreement or any right or remedy available hereunder or at law or equity shall not be construed to be a waiver of such provision or of any available right or remedy. In addition, no single or partial exercise of any right, power or privilege hereunder shall preclude the enforcement of any further exercise or exercise of any right, power or privilege hereunder.

29.        Notice

Any notice required to be given hereunder shall be in writing and sent by overnight courier, e.g., FedEx, (overnight delivery or the earliest delivery shall be specified) or by facsimile (with confirmation of receipt) as set forth in Paragraph 17 of Part I of this Agreement.

30.        Prior Agreements or Understandings and Modifications

This Agreement, which includes the terms and conditions, sets forth the entire understanding between the parties with respect to the subject matter herein, and supersedes and replaces the terms of any and all prior discussions, agreements or understanding between the parties. This Agreement may not be modified or amended except by a written agreement signed by the parties.

31.        Governing Law

This Agreement shall be deemed to have been made in Boca Raton, Palm Beach County, Florida, U.S.A., and shall be interpreted, and the rights and liabilities of the parties hereto determined in accordance with the laws of the state of Delaware, U.S.A. without regard to the conflict of laws principles. The parties consent and hereby submit to the non exclusive jurisdiction of the state and federal courts located in Palm Beach County, Florida, U.S.A. for the determination of any and all issues between the parties related to this Agreement. Nothing in this clause limits the right of the parties to bring proceedings in any other jurisdiction, whether concurrently or otherwise. The Supplier irrevocably waives the application of the U.S. Foreign Sovereign Immunities Act, 28 U.S.C. et seq., and the United Nations Convention on Sale of Goods.

13





32.        Force Majeure

Except for the obligation to pay for the Units provided or other material and/or services provided under this Agreement, neither party hereto shall be liable for its failure to perform hereunder, in whole or in part, due to contingencies beyond its reasonable control (provided such inability stems form scarcity or difficulty and not from delays by suppliers in placing orders), including strikes, riots, war, fire, explosions, acts of God, injunctions, compliance with any law, regulation or order, whether or not valid, of any governmental body or any instrumentality thereof, whether now existing or hereto created; provided, however, that the parties shall use reasonable efforts to continue to meet their obligations for the duration of the force majeure condition; and provided further, that the party declaring force majeure shall notify the other party promptly in writing of the commencement of the condition, the nature, and the termination of the force majeure condition. In the event that the period of a force majeure should last for more than 6 months, Supplier, upon the written request of Sunbeam, provide the Tooling and Design to Sunbeam or its designee and Sunbeam shall have the right to immediately produce the Units at another manufacturer during the force majeure event. Forthwith upon the reason regarding force majeure ceasing to exist, the party relying upon it shall give written advice to the other of this fact and the operation of this Agreement shall return to normal. In the event that Sunbeam has exercised its right by producing the Units at another manufacturer, Supplier shall have the first right to produce the Units. In the event that the Tooling and/or Design are owned by Supplier, Sunbeam and Supplier shall negotiate a reasonable royalty payment to Supplier for such use. However, the transfer of Tooling and/or Design shall not be delayed such negotiations are commenced or completed.

33.        Miscellaneous

This Agreement does not in any way create the relationship of principal and agent, joint-venture or partnership between the parties or any other form of association which would impose on any party liability for the act or failure to act of the other party or parties; and under no circumstances shall one party be considered to be the agent of the other party. Neither party shall act or attempt to act, or represent itself, directly or by implication, as an agent of the other party or in any manner assume or create, or attempt to assume or create, any obligation on behalf of, or in the name of, the other party.

The various section headings are inserted for purposes of reference only and shall not effect the meaning or interpretation of this Agreement or any provision hereof.

34.        Y2K

Supplier warrants and represents that to the best of its knowledge all systems, processes, software, hardware and equipment supplied pursuant to this purchase order shall be Year 2000 Ready. Systems, processes, software, hardware and equipment are "Year 2000 Ready" if they can operate normally before, on and after December 31, 1999 without additional user intervention. This includes, but is not limited to, accepting date input, providing date output, and performing calculations and comparisons on dates or portions of dates. Date interpretation and manipulation must be correct for all valid dates, and sequencing by date must produce the desired results for all dates. Systems, processes, software, hardware or equipment cannot be certified as "Year 2000 Ready" until they are tested to prove that they can operate normally using date information before, on and after December 31, 1999.

35.        Prohibited Countries/Persons/Impermissible Conduct

Supplier agrees that it will not acquire for use in the performance of this order any merchandise, equipment, supplies, or services originating from, processed in, or transported from or through, the countries and/or persons prohibited from commerce by the United States Government. A current list of prohibited countries/persons is available from Sunbeam's purchasing representative. This restriction includes merchandise, equipment, supplies or services from any other country/person that is restricted by law, regulation or executive order at any time during performance of the contract. If Sunbeam authorizes Supplier to subcontract, Supplier shall include this provision in such subcontract(s).

14



36.        Additional U.S. Government Regulations

Without limiting Supplier's obligation to comply with applicable laws and regulations as contained in this Agreement, Supplier agrees to comply with the following contract clauses, to the extent those clauses are applicable to Supplier:

Federal Acquisition Regulation ¶ 52.222-26, Equal Opportunity (E.O. 11246);
Federal Acquisition Regulation ¶ 52.222-35, Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (38 U.S.C. 4212); and
Federal Acquisition Regulation ¶ 52.222-36, Affirmative Action for Workers with Disabilities (29 U.S.C. 793).

The full text of those clauses, which may be found in 48 United States Code of Federal Regulations (C.F.R.) Chap 1, are incorporated into the text of this order. The version of the clause in effect as of the date this Agreement is applicable. Sunbeam shall have the right to unilaterally amend this Article to add or delete to the list of the above U.S. regulations to ensure compliance with applicable U.S. government requirements.

37.        No Gratuities

By entering into this Agreement, except with Sunbeam's consent, Supplier certifies that it and its representatives did not offer, solicit, accept or provide (or attempt to offer, solicit, accept, or provide) any gratuity (entertainment, gifts, money, or other thing of value) to Sunbeam or any of Sunbeam's representatives for the purposes of obtaining or rewarding favorable treatment in connection with this Agreement or its award or in connection with any subcontracts of Supplier under this Agreement or their award. Supplier agrees to indemnify Sunbeam for any liabilities, costs, damages, or expenses it incurs (including attorneys' fees, costs of investigation and expenses) as a consequence of any such gratuity being offered, solicited, accepted or provided by Supplier or Supplier's representatives or any attempt to do so.

15



IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed by an authorized representative as of the day and year first written above.

WITNESS

ANTHONY CHU

SUNBEAM PRODUCT INC.

_____
(Signature)

Michael P. Bitter
_____
(Print name)

General Manager – Asian Sourcing Operations
_____
(Title)

April 19, 2000
_____
(Date)

WITNESS

Simon Chan
Chol, Hon Keung Simon.

SIMATELEX MANUFACTORY CO. LTD

For and on behalf of
Simatelex Manufactory Company Limited
_____
(Signature)

Yvonne Lam
_____
(Print name)

Sales Director
_____
(Title)

April 19, 2000
_____
(Date)

Yvonne Lam
Sales Director

16

# Supplementary Agreement

**THIS AGREEMENT** is made on the 19th June , 2000.

**BETWEEN :**

(1)      **Simatelex Manufactory Company Limited** whose registered office is situate at 9/F., Chaiwan Industrial Centre, 20 Lee Chung Street, Chaiwan, Hong Kong (Simatelex") ;      and

(2)      **Sunbeam Products, Inc., a Delaware corporation** having a place of business at (Sunbeam") 2381 Executive Center Drive, Boca Raton, FL 33431, USA.

**WHEREAS**

(1) Simatelex and Sunbeam had entered into a Supply Agreement dated 21st Feb., 2000 (Supply Agreement") whereby Simatelex agreed to supply Coffeemakers and Sunbeam agreed to receive the same subject to the terms and conditions therein.

(2) At the request of Sunbeam in respect of Model AD4 and NLX23, Simatelex further agreed to enter into this agreement subject to the terms and conditions herein.

**IT IS AGREED THAT**

1. For the [Model AD4], Sunbeam warrants and represents that it has or shall have all the right, whether intellectual or not, including but not limited to its tooling, to produce such products and should indemnify Simatelex in the event that there are any claims and /or legal proceedings of the same against Simatelex.

2. For [NLX23BP], Sunbeam warrants and represents that Sunbeam have and/or all the right including the license to use, market and sell such milk frothier being a supplied accessory from a third party: namely a DC operated CAFÉ FROTH® TURBO (Model no. 7029-42) and agrees to indemnify Simatelex in the event that there are any claims and /or legal proceedings (whether intellectual property, product liability or otherwise) against Simatelex.

3. All other terms and conditions in the Supply Agreement shall remain unchanged.

Ref : F\CA\SB\SA                                    1



EXHIBIT
B

4.   This Agreement shall prevail should there be any inconsistency between this Agreement and the Supply Agreement.

IN WITNESS WHEREOF, the undersigned have executed. this Agreement as of its effective date.

---

Simatelex Manufactory Co. Ltd.

For and on behalf of
Simatelex Manufactory Company Limited

---

Yvonne Lam
Sales Director

---

Sunbeam Products Inc.

July 5, 2000

Ref:F\CA\SB\SA

2

03/28/00  TUE 11:10 FAX 8019124430        OPERATIONS                                    ☑002



Asian Sourcing Operations
9F, Top Glory Tower
262 Gloucester Road
Causeway Bay, Hong Kong
Tel: 852 – 21164238
Fax: 852 – 29580738
e-mail: jhn@sunbeam.com.hk

To:        Yvonne Lam
           Simatelex

From:      J. Nugent

cc:        L. D'Amico

Subject:   Tooling / Production commitments

Date:      March 13, 2000

Listed are the commitments both Sunbeam and Simatelex are providing with respect to capacity increases:

*Simatelex is committing to the following:*

1. Increase the monthly capacity of PR series coffeemakers to 92,000 per month with the following tooling for which Simatelex will absorb the tooling cost:
   - Base mold for PR14/15
   - Base plate die for PR14/15
   - Base mold for PR20 (suitable for all PR models except PR14/15/5/6)
   - Dust lid / Top cover mold
   - Reservoir mold
   - Funnel housing mold
   - Inner funnel mold

   Capacity increase will be production ready by July 1, 2000.

2. Increase the monthly capacity of the AD10/12 series coffeemakers to meet current Sunbeam forecast dated March 14, 2000 (issued by Sunbeam planning) with the following tooling for which Simatelex will absorb the tooling cost:
   - Base: Switch mold
   - Base Cover: Switch mold

   Capacity increase will be production ready by July 1, 2000.

3. Simatelex will produce all the tooling required to manufacture the AD4 to meet an annual demand of 180,000 units for which Simatelex will absorb all the tooling costs.

4. Simatelex will develop as required, tooling necessary to produce the stainless steel liner and the potted thermostat for the DSP10. All other tools for the DSP10 will transferred to Simatelex by Sunbeam.



EXHIBIT
C

OPERATIONS                                                    @003

5. Simatelex will provide Sunbeam with a 1% price reduction on all coffeemakers produced for Sunbeam and it's affiliates except the AD4, NL4, and current NL line extensions in process. These price reductions will become effective June 1, 2000 and will be based on the current prices indicated in the Simatelex price listing dated December 17, 1999 effective January 1, 2000.

**2./ Tooling / Production Commitments**

6. Simatelex and Sunbeam will execute and sign Sunbeam's standard "Supply Agreement" no later than June 2000.

*Sunbeam is committing to the following:*

1. Based on actual shipments from Simatelex in 1999, Sunbeam is committing to order an additional volume of PR series coffeemakers, BL series coffeemakers, and TM series teamakers totaling 500,000 units to be produced between June 1, 2000 and March 30, 2001.

2. All forecasted demand for the AD10/12/4 series coffeemakers will be ordered from Simatelex starting immediately as long as Simatelex has the capacity to produce to the demand. This commitment will continue until such time as these products become obsolete or 3 years, whichever is sooner.

3. All forecasted demand for the DSP10 coffeemaker will be ordered from Simatelex starting as soon as Simatelex is production ready. This commitment will continue until such time as the product becomes obsolete or 3 years, whichever is sooner.

4. Sunbeam will move all DSP10 coffeemaker tooling which is owned by Sunbeam to Simatelex during the 3rd quarter of 2000.

Simatelex Manufactory Co., Ltd.

_____
Authorized Signature

_____
John McNaboe
Senior Vice President, Operations
Sunbeam Corporation

Ester C.L. Suen
Managing Director
Simatelex Manufactory Co., Ltd.