UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :

WING SHING PRODUCTS (BVI), LTD.,      :      01 Civ. 1044 (RJH)
           :

         Plaintiff,      :
           :

           :   **MEMORANDUM OPINION**
     -against-       :   **AND ORDER**
           :

SIMATELEX MANUFACTORY CO., LTD.,   :
           :

         Defendant.     :
           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Wing Shing Products (BVI), Ltd. ("Wing Shing") brings this action

against Hong Kong–based defendant Simatelex Manufactory Co., Ltd. ("Simatelex") to

enforce its rights in United States Design Patent No. 348,585 (the "Design Patent"),

asserting claims of direct patent infringement in violation of 35 U.S.C. § 271(a) and

active inducement of patent infringement in violation of 35 U.S.C. § 271(b).  Now

pending before the Court are defendant's motion to dismiss for lack of personal

jurisdiction, or in the alternative, for summary judgment on liability [71] and plaintiff's

motion for summary judgment on liability [filed under seal, December 20, 2005].

Defendant's motion to dismiss for lack of personal jurisdiction and motion for summary

judgment are DENIED.  Plaintiff's cross-motion for summary judgment on liability is

GRANTED in part.


## BACKGROUND

      Wing Shing is a corporation organized and existing under the laws of the British

Virgin Islands with a place of business in Hong Kong.  (Compl. ¶ 4.)  Wing Shing owns

the Design Patent for a coffeemaker.  Beginning around 1992, Wing Shing manufactured

and sold coffeemakers made with the patented design to Sunbeam Products, Inc.

("Sunbeam")—a Delaware corporation with its principal place of business in Palm Beach

County, Florida[1]—or to its predecessor, Mr. Coffee, Inc.  Simatelex—a Hong Kong

corporation with its principal place of business in Hong Kong (Compl. ¶ 5)—also

manufactured AD Series coffeemakers for Sunbeam and its predecessor.

## I.    Procedural History

This action against Simatelex has a lengthy procedural history that relates, in part,

to litigation between Wing Shing and Sunbeam.  Sunbeam filed a petition for bankruptcy

in the Southern District of New York on February 4, 2001.  The complaint in this action

was filed days later, on February 9, 2001, after which it is undisputed that Simatelex was

aware of the existence of the Design Patent.  On February 23, 2001, Sunbeam

commenced an adversary proceeding against Wing Shing in bankruptcy court seeking a

declaratory judgment that Sunbeam owned the Design Patent, or had a permanent license

for it (the "Sunbeam Action").  By order dated February 26, 2001, Wing Shing was

enjoined by the bankruptcy court from prosecuting this action against Simatelex pending

its resolution of the Sunbeam Action.  In the Sunbeam Action, the bankruptcy court

found that the Design Patent was valid, that Sunbeam had no rights in the Design Patent,

and that Sunbeam infringed the Design Patent.  As a result, the bankruptcy court

permanently enjoined Sunbeam from infringing the Patent and awarded damages to Wing

---

[1] *See In re AI Realty Marketing of New York, Inc.*, 293 B.R. 586, 594 (Bankr. S.D.N.Y. 2003) (adversary proceeding brought by Sunbeam against Wing Shing regarding dispute arising out of Design Patent at issue in this litigation; this Court later entertained the appeal from the bankruptcy court's opinion, see *infra* discussing procedural history).

Shing. *In re AI Realty Marketing of N.Y., Inc.*, 293 B.R. 586 (Bankr. S.D.N.Y. 2003). Both parties then appealed that decision to this Court.

By Memorandum Opinion and Order dated June 29, 2004, this Court upheld the bulk of the bankruptcy court's finding, including, *inter alia*, the findings that (1) Sunbeam was not a joint inventor of the Design Patent, (2) Sunbeam did not have joint ownership rights in the Design Patent, (3) Sunbeam did not have a permanent exclusive license to the Design Patent; (4) Wing Shing is not equitably estopped from enforcing the Design Patent as against Sunbeam, and (5) the Design Patent is otherwise enforceable. *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378, 388–99 (S.D.N.Y. 2004). Both parties thereafter appealed to the Federal Circuit. By order dated June 29, 2004, this Court lifted the stay in this action, and upon the completion of discovery the parties filed cross-motions for summary judgment substantially similar to the ones now pending before the Court. However, upon concurrent motion by defendant for a stay of the proceedings pending the outcome of the Sunbeam Action appeal to the Federal Circuit, the Court entered a further stay and dismissed the pending summary judgment motions without prejudice to renew following the resolution of the appeal. *See Wing Shing Prods. (BVI), Inc. v. Simatelex Manufactory Co., Ltd.*, 01 Civ. 1044 (RJH), 2005 WL 912184 (S.D.N.Y. Apr. 19, 2005).

By decision dated August 24, 2005, the Federal Circuit affirmed this Court's decision in the Sunbeam Action, 150 F. App'x 703 (Fed. Cir. Aug. 24, 2005), and the stay in this action was lifted shortly thereafter, on September 13, 2005, at which time a briefing schedule for the pending motions was set. Sunbeam's petition to the United States Supreme Court for a writ of certiorari was denied on January 9, 2006, *Sunbeam*

*Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 126 S. Ct. 1085 (2006), bringing the Sunbeam Action to an end and resolving conclusively the issue of Sunbeam's infringement of Wing Shing's Design Patent.

## II.     Factual Background

Unless otherwise indicated, the following background facts are undisputed.  John C.K. Sham (president of Wing Shing) is the inventor of the Design Patent, which covers a design for a line of automatic drip coffeemakers marketed as the "AD Series."  (United States Patent No. Des. 348,585, Dunnegan Decl. Ex. A.)  Sham assigned the Design Patent to Wing Shing , and Wing Shing now owns it.  (Assignment of Invention, Dec. 15, 1998, Dunnegan Decl. Ex. B; Responses of Simatelex Manufactory Co., Ltd. to Wing Shing's First Set of Requests for Admissions, Oct. 19, 2004 ("Simatelex Admissions"), Dunnegan Decl. Ex. C.)  Simatelex and Sunbeam entered into a contract on February 19, 2000 (the "Supply Agreement"), whereby Simatelex agreed to supply Sunbeam with AD Series coffeemakers.  (Supply Agreement, Feb. 21, 2000, Dunnegan Decl. Ex. F.)  Simatelex manufactured various models of the AD Series coffeemakers for Sunbeam.  (Simatelex Admissions; *see also* Dunnegan Decl. Ex. D.)[2]  The coffeemakers were made according to product specifications provided to Simatelex by Sunbeam.  (*See* Supply Agreement Part I, ¶¶ 1, 9, Part II, ¶¶ 2a, 10a.)  The parties no longer dispute that the design of the coffeemakers manufactured by Simatelex for Sunbeam is covered by the Design Patent.

---

[2] The following models of the AD Series were manufactured by Simatelex:  AD4, AD5, ADX10, AD12, AD12BLK, ADS12, ADX20, ADX20-2, ADX23, and MCC120.  (Dunnegan Decl. Ex. C (Nos. 8, 16, 18, 26, 28, 32, 40, 44, 50, 56).)  The three basic models of the AD Series coffeemakers are the AD4, AD10, and AD12, with the number referring to the number of cups.  The variations on the models involve different colors, automatic shut-off, a clock, or a bonus product in the package.  (Yvonne F.K. Lam Dep. ("Lam Dep.") 7:23–20:14, Nov. 9, 2004, Dunnegan Decl. Ex. E.)

The parties also do not dispute that the negotiations preceding the entry into the Agreement, and the actual physical execution of the Agreement, all occurred in Hong Kong.  (Tr. 22:22–23:12, Oct. 27, 2006; Pl.'s Supp. Mem. 12.)  According to the Supply Agreement's "Governing Law" provision, the Agreement was deemed to be made in Florida, and the contracting parties agreed their rights and liabilities under the Agreement would be determined under Delaware law.  (Supply Agreement Part II, ¶ 31.)  The Supply Agreement also provides that the "FCA point (Incoterms 1990)[3] to which Supplier shall deliver Units . . . shall be at Hong Kong." (*Id.* Part I, ¶ 7.)  With respect to "Shipment, Delivery, and Title," the Supply Agreement provides that the "Units are to be delivered FCA to [Hong Kong]." (*Id.* Part II, ¶ 7(a).)  Finally, the Agreement includes the following integration clause:  "This Agreement, which includes the terms and conditions, sets forth the entire understanding between the parties with respect to the subject matter herein, and supersedes and replaces the terms of any and all prior discussions, agreements, or understanding between the parties.  This Agreement may not be modified or amended except by a written agreement signed by the parties." (*Id.* Part II, ¶ 30.)

Simatelex manufactured the coffeemakers in China.  (Def.'s Supp. Rule 56.1 Statement ¶ 5.)  After the coffeemakers had been manufactured, the coffeemakers were transferred (either by Simatelex or a carrier selected by Sunbeam) to the port in Hong

---

[3] "Incoterms" are "International Commercial Terms" issued by the International Chamber of Commerce, and are designed to provide a set of international rules for the interpretation of the most commonly used trade terms in foreign trade.  (Pang Supp. & Am. Decl. 2); *see also SKI Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 314 n.4 (E.D.N.Y. 2006) (citing *Texful Textile Ltd. v. Cotton Express Textile, Inc.*, 891 F. Supp. 1381, 1389 n.6 (C.D. Cal.1995) (noting that Incoterms are the most widely recognized non-statutory definitions of trade)).  An FCA term, or "Free Carrier," provides that upon delivery to a location designated by the buyer, delivery is complete and the risk of loss of or damage to the goods transfers from seller to buyer.  (*See Incoterms 1990*, Dunnegan Decl. Ex. AA.)

Kong or the port in Yantian, China, as designated by Sunbeam,[4] and ultimately transported by ship to the United States. (Def.'s Suppl. Rule 56.1 Statement ¶ 6; Chan Man Fai Decl. 2, Dec. 8, 2005 ("Chan Decl."), Def.'s Ex. 11.) Simatelex prepared three sets of original bills of lading and an invoice, which were forwarded by Simatelex's bank in Hong Kong in the form of a "Bill Presentation Schedule" to Bank One, designated by Sunbeam to serve as the collecting bank. (Janice Fay Gavin Dep., Oct. 24, 2005 ("Gavin Dep.") 22:17–23:06, Dunnegan Decl. Ex. U; *see also* Chan Decl. 3.) Although the parties dispute precisely when,[5] at some point Simatelex's invoices began to include the following language: "Title of the goods shall not pass until unconditional payment of the goods." (Dunnegan Decl. Ex. H; Pang Suppl. & Am. Decl. 3–4.) Simatelex added this language to its invoices unilaterally, and Sunbeam never expressly agreed to the additional terms contained in the invoices. (Pang Suppl. & Am. Decl. 4.) After Sunbeam's treasury department had wired payment for a given invoice, Bank One would release to Sunbeam the applicable original bill of lading. (Gavin Dep. 23:14–28:20; 19:18–20:08.) Once Sunbeam had the original bill of lading, it would be forwarded to Sunbeam's customs broker, who prepared customs entry papers, paid ocean freight, and arranged for release of the merchandise. (Gavin Dep. 21:21–22:16.) Sunbeam paid Simatelex—i.e., wired funds to Bank One to effectuate release of the original bill of lading—for some of the coffeemakers after the coffeemakers had either arrived in a U.S.

---

[4] According to the undisputed Declaration of Chan Man Fai, Simatelex's Manager of Finance and Accounting, Sunbeam-designated shipping agents advised Simatelex to which terminals the coffeemakers should be delivered. Upon delivery to the terminal, a "Mate Receipt/Dock Receipt" would be released to the truck driver who delivered the coffeemakers. Once the coffeemakers were loaded onto the ship designated by Sunbeam to carry the coffeemakers to the United States, Sunbeam's shipping agent would release the bill of lading to Simatelex. Simatelex disclaims any role in loading the coffeemakers onboard the Sunbeam-designated ships. (Chan Decl. 2.)

[5] Either when Sunbeam filed for bankruptcy on February 4, 2001 (according to plaintiff) or at some earlier date when Simatelex became aware of Sunbeam's precarious financial position (according to defendant).

port or had been placed on U.S. soil and/or rail for transport to their ultimate destinations. (*See* Pl.'s Nov. 7, 2005 56.1 Statement ¶¶ 8–16; Def.'s Response to Pl.'s Nov. 7, 2005 56.1 Statement ¶ 8.)  Bank One would then remit payment to Simatelex's Hong Kong bank's corresponding United States bank, per instructions in the Bill Presentation Schedule.  (Chan Decl. 3–4.)  Simatelex had no account at Bank One, nor did its Hong Kong bank have an account with Bank One.  (*Id.*)

## DISCUSSION

Now pending before the Court are defendant's motion to dismiss for lack of personal jurisdiction, or, in the alternative, for summary judgment on the issue of liability, and plaintiff's motion for summary judgment on the issue of liability.

## I.    Applicable Legal Standards

### A.    Motion to Dismiss for Lack of Personal Jurisdiction under 12(b)(2)

In the face of a challenge to personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the plaintiff has the burden of establishing in personam jurisdiction.  *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994); *see also Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  As jurisdictional discovery (as well as merits discovery) has been conducted, plaintiff bears "the burden of proving by a preponderance of the evidence that personal jurisdiction exists," *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990), and, plaintiff's "prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant . . . [and this] prima facie showing must be factually supported," *Ball v.*

*Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990); *see also Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 567 (S.D.N.Y. 2006) (Holwell, J.); *Brown v. Grand Hotel Eden*, No. 00 Civ. 7346 (NRB), 2003 WL 21496756, at *3 (S.D.N.Y. June 30, 2003).

### B.    Summary Judgment on Liability under Rule 56(c)

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006) (Holwell, J.). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Id.*; *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a

genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson*, 477 U.S. at 252).

## II.    Personal Jurisdiction over Simatelex

"Determining whether the district court has jurisdiction over an out-of-state defendant involves two inquiries: whether the forum state's long-arm statute permits service of process and whether the assertion of personal jurisdiction would violate due process." *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1333 (Fed. Cir. 2001). In this case the Court must apply the New York long-arm statute, which does not extend as far as federal due process permits. *See Talbot v. Johnson Newspaper Corp.*, 522 N.E.2d 1027, 1029 (N.Y. 1988) (citing *Banco Ambrosiano v. Artoc Bank & Trust*, 464 N.E.2d 432 (N.Y. 1984)); *Ingraham v. Carroll*, 687 N.E.2d 1293, 1295 (N.Y. 1997) ("[T]he subdivision [302(a)(3)] was not designed to go to the full limits of permissible jurisdiction. The limitations contained in subparagraphs (i) and (ii) were deliberately inserted to keep the provision well within constitutional bounds." (bracketed language in original, internal citations and quotation marks omitted)). Therefore the Court may limit its inquiry to whether Wing Shing can establish that personal jurisdiction is proper under the New York long-arm statute. *See Pieczenik*, 265 F.3d at 1333.

Wing Shing argues that Simatelex is subject to personal jurisdiction under both sections 302(a)(1) and 302(a)(3) of New York's long-arm statute, which provide in relevant part:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may

> exercise personal jurisdiction over any non-domiciliary, or his
> executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts
>    anywhere to supply goods or services in the state; or
>    . . .
> 3. commits a tortious act without the state causing injury to
>    person or property within the state, except as to a cause of
>    action for defamation of character arising from the act, if he
>    > (i) regularly does or solicits business, or engages in
>    >     any other persistent course of conduct, or derives
>    >     substantial revenue from goods used or consumed
>    >     or services rendered, in the state, or
>    > (ii) expects or should reasonably expect the act to have
>    >     consequences in the state and derives substantial
>    >     revenue from interstate or international commerce.

N.Y. C.P.L.R. 302(a) (McKinney 2001).

### A.    N.Y. C.P.L.R. 302(a)(1)

The New York Court of Appeals has identified two basic elements for predicating

jurisdiction under 302(a)(1):  "[L]ong-arm jurisdiction over a nondomiciliary exists

where (i) a defendant transacted business within the state and (ii) the cause of action

arose from that transaction of business.  If either prong of the statute is not met,

jurisdiction cannot be conferred under CPLR 302(a)(1)."  *Johnson v. Ward*, 829 N.E.2d

1201, 1202 (N.Y. 2005); *see also Pieczenik*, 265 F.3d at 1333 ("[The Federal Circuit has]

held that for a court to assert jurisdiction over a defendant under section 302(a)(1), the

plaintiff must satisfy two requirements:  (1) the defendant's business activities in New

York must be activities by which the defendant projects itself into New York in a way as

to purposefully avail itself of the benefits and protections of New York laws and (2) the

plaintiff's cause of action must arise out of that business activity within the state.").  To

determine whether a nondomiciliary has "transacted business" within New York, courts

should consider the totality of the circumstances, including "(1) whether the defendant

has an ongoing contractual relationship with a New York corporation; (2) whether the defendant negotiated or executed a contract in New York, and whether the defendant visited New York after executing the contract with the parties; (3) whether there is a choice-of-law clause in any such contract; and (4) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." *Beatie & Osborne LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 387 (S.D.N.Y. 2006) (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)).

Wing Shing argues that Simatelex transacted business in the state and that its causes of action arise from that transaction of business as a result of New York–based Bank One's involvement in Simatelex's transactions with Sunbeam. Specifically, Wing Shing argues that Simatelex's "receipt of funds in New York" supports personal jurisdiction under section 302(a)(1). (Pl.'s Opp'n Mem. 16.) In support of this argument, Wing Shing points solely the fact that in acting as the collecting bank, Bank One would send a copy of the bill of lading to Sunbeam, after which Sunbeam would forward to Bank One the funds necessary to satisfy a particular Simatelex invoice. Bank One would then, in turn, release the original bill of lading to Sunbeam, and transmit Sunbeam's payment to Simatelex's bank. As plaintiff points out, personal jurisdiction may be established in such cases where, "looking at the totality of the defendant's activities within the forum, purposeful acts have been performed in New York by the foreign corporation in relation to the contract, albeit preliminary or subsequent to its execution." *China Union Lines, Ltd. v. Am. Marine Underwriters, Inc.*, 454 F. Supp. 198, 202 (S.D.N.Y. 1978) (internal quotation marks and citations omitted). However, considering

the totality of the circumstances, the facts in this case do not suffice to establish that Simatelex "transacted business" in New York within the meaning of section 302(a)(1). In *China Union Lines*, upon which plaintiff primarily relies, the court found that, in the aggregate, the defendants had engaged in purposeful activity in New York where they directed letters, phone calls, and telex messages directly to New York pertaining to the disputed transaction, negotiated that transaction with a New York–based broker, and agreed to send all payments arising out of the transaction to New York. *Id.* These jurisdictional facts are clearly distinguishable from those presently before the Court. Plaintiff's reliance on *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508 (N.Y. 1970) is also misplaced. In *Parke-Bernet*, the defendant participated in an auction in New York via telephone from California, and as a consequence was found to have transacted business within the state under section 302(a)(1). The differences between *China Union Lines* and *Parke-Bernet* and the case now pending before the Court are readily apparent. In this case, defendant did not "purposefully project[] itself into New York." *Pieczenik*, 265 F.3d at 1333. Rather, the transactions' connection with New York was the fortuitous result of *Sunbeam's* designation of Bank One as the collecting bank. In addition, Simatelex did not have an account at Bank One, and its receipt of payment on its invoices in fact occurred outside the State of New York. The record is devoid of any evidence that Simatelex ever negotiated or executed a contract with Bank One in New York, maintained an ongoing contractual relationship with Bank One, visited New York, or otherwise availed itself of the benefits and protections of New York laws. *See Beatie & Osborne*, 431 F. Supp. 2d at 387; *Pieczenik*, 265 F.3d at 1333. However, plaintiff has also asserted that there is personal jurisdiction under section 302(a)(3).

12

### B.    N.Y. C.P.L.R. 302(a)(3)

Under 302(a)(3), plaintiff "must show both that an injury occurred 'within the state,' and that the elements of either clause (i) or (ii) have been satisfied." *Ingraham*, 687 N.E.2d at 1294.  As noted, "[s]ubdivision (a)(3)(i) requires the party seeking to obtain jurisdiction to demonstrate that the tortfeasor 'regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state.'" *Id.* at 1295.  Subdivision (a)(3)(ii) "requires the satisfaction of two prongs.  To establish jurisdiction, a plaintiff must demonstrate that the nonresident tortfeasor: (1) 'expects or should reasonably expect the act to have consequences in the state'; and (2) 'derives substantial revenue from interstate or international commerce.'"  *Id*.  "The first prong is intended to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere.  The nonresident tortfeasor must expect, or have reason to expect, that his or her tortious activity in another State will have direct consequences in New York."  *Id.*  "The substantial interstate commerce revenue component, on the other hand, narrows the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but 'whose business operations are of a local character.'"  *Id.* at 1296.

Simatelex does not dispute the existence of a wrong committed outside the forum.  Nor is it disputed that defendant derives substantial revenue from international commerce.  (*See* Lam Dep. 86:01–87:07.)  Rather the parties contest whether Simatelex's out-of-state activity caused tortious injury within New York, and whether Simatelex

expected or should have expected that its activity would have consequences in New York.

These issues may both be resolved by reference to the Federal Circuit's decision in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).[6] In *Beverly Hills Fan*, the court considered, in circumstances very similar to those here, whether a foreign manufacturer of ceiling fans could be subject to personal jurisdiction in Virginia. The defendants in that case were Ultec, a Chinese corporation that manufactured the accused ceiling fans in Taiwan, and Royal, a New Jersey corporation that purchased said ceiling fans from Ultec, and then imported them into and distributed them within the United States. *Id.* at 1560. Following jurisdictional discovery, it was undisputed that Ultec made no direct shipments into the United States, but rather sold to Royal, who in turn imported the fans and then distributed them throughout the United States (including Virginia) through an intermediary. *Id.* at 1563. The Federal Circuit concluded that shipments into the forum were "purposeful and knowing" in light of an "ongoing relationship" with a retailer in the forum, as established, importantly, by uncontested evidence that at least fifty-two fans manufactured by Ultec and distributed by Royal were available for sale by a retailer in Virginia. On this basis, the Federal Circuit concluded that both Ultec *and* Royal knew or reasonably could have foreseen that the fans would eventually be sold by a retailer in Virginia. *Id.* at 1564. In addition, the Federal Circuit concluded that upon this evidence, no further development of the record was necessary to determine whether, as a matter of law, personal jurisdiction could be

---

[6] Even when applying a state long-arm statute, it is appropriate to look to federal law for purposes of determining the situs of the "tort" of patent infringement, because an action for patent infringement is not truly a tort but rather a federally created and defined cause of action. *North Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (considering situs of patent infringement to determine whether requirements of Illinois long-arm statute had been met).

properly exercised under the Due Process Clause or Virginia's long-arm statute. *Id.* As with the New York long-arm statute, in order to satisfy the Virginia long-arm statute it was necessary to establish that a "tortious injury" had occurred within the forum. *Id.* at 1570. The Federal Circuit held, on the foregoing undisputed facts, that "the situs of the injury is the location, or locations, at which the infringing activity directly impacts the interests of the patentee, here the place of the infringing sales is Virginia." *Id.* at 1571.

Although Sunbeam's method of recordkeeping did not allow Wing Shing to determine which coffeemakers shipped into New York by Sunbeam were Simatelex-manufactured units versus Wing Shing–manufactured units, there is evidence that in the years 2000 and 2001 respectively, Sunbeam purchased 64.4 and 83.5 percent of its coffeemakers from Simatelex and 35.6 and 16.5 percent from Wing Shing. (Dunnegan Decl. Ex. M at SUN 000075.) Sunbeam's representative testified there was no reason to conclude that Sunbeam's sales to customers in New York would involve a materially different mix of Simatelex-manufactured versus Wing Shing–manufactured coffeemakers. (Alan LeFevre Dep., Nov. 23, 2004 at 31:02–31:15, Dunnegan Decl. Ex. L.) A review of Sunbeam's records reflects that in 2001 and 2002, Sunbeam shipped 44,811 and 34,996 AD Series coffeemakers to New York–based retailers, respectively. (Dunnegan Decl. Ex. N.) A representative from Kmart (a nationwide retail outlet) submitted a business record reflecting its sales of Sunbeam AD Series coffeemakers in New York for the years 1998 through 2004. (Rose Sanders Decl., Nov. 29, 2004, Ex. B, Dunnegan Decl. Ex. P.) It reflects that in 2001, Kmart sold 1,515 AD Series coffeemakers in New York, and in 2002, it sold fifty-four. (*Id.*) Similar records submitted by Target (another nationwide retail outlet) reflect that hundreds of Sunbeam

AD Series coffeemakers were sold in Target's New York retail outlets in 2000, 2001, and 2002. (Emily Dowd Decl., Dec. 20, 2004, Ex. B., Dunnegan Decl. Ex. Q.)  In addition, Simatelex's director of sales, Yvonne Lam, testified that since at least February 2001, she knew that Sunbeam sold to Wal-Mart, and that Wal-Mart has a presence across the United States. (Lam Dep. 76:22–79:08.)  Based on the foregoing record, and in the absence of any attempt by Simatelex to refute this evidence, the Court finds that tens of thousands of AD Series coffeemakers manufactured by Simatelex for Sunbeam were sold in the State of New York each year from 2000 to 2002.

Here, as in *Beverly Hills Fan*, we have a foreign manufacturer of infringing products who sold to a United States–based distributor.  Thereafter, the United States–based distributor distributed the infringing products, either directly (in our case) or through an intermediary (in *Beverly Hills Fan*), into the forum state.  In both cases, infringing products originally manufactured by the foreign manufacturer were made available for purchase through retailers within the forum.  In *Beverly Hills Fan*, the Federal Circuit found these facts to be conclusive, as a matter of law, in finding that (1) the foreign manufacturer knew, or reasonably could have foreseen that the infringing products would be sold in the forum and (2) that a tortious injury was suffered by the patentee within the forum, as a result of those sales.  21 F.3d at 1564, 1571.  If anything, the case here presents stronger factual support for a finding of personal jurisdiction, because the link between the foreign manufacturer and the eventual retail sale of the infringing product in the forum state is less attenuated.  Furthermore, there is evidence that Simatelex had knowledge that the coffeemakers it manufactured were eventually resold in New York; evidence that was absent from the record in *Beverly Hills Fan*.

16

Taken together these facts support a conclusion that defendant here should reasonably have expected its conduct to have consequences in New York. In sum, the Court concludes that plaintiff has carried its burden in establishing that Simatelex is subject to personal jurisdiction under section 302(a)(3); namely, that Simatelex's alleged out-of-state tortious activity caused an injury within New York, and that Simatelex should reasonably have expected the act to have consequences in New York and derives substantial revenue from international commerce. *See Ingraham*, 687 N.E.2d at 1294–95; *see also Beverly Hills Fan*, 21 F.3d at 1564, 1571.

## III.    Liability for Direct Infringement under 35 U.S.C. § 271(a)

United States patent law provides: "Whoever without authorization makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore [directly] infringes the patent." 35 U.S.C. § 271(a). As the statute makes clear, and as the Federal Circuit has frequently confirmed, the only activities relevant to direct infringement are those activities that take place within the borders of the United States; extraterritorial activities are entirely irrelevant. *See Rotec*, 215 F.3d at 1251 (quoting *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 650 (1915)); *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375–76 (Fed. Cir. 2005) ("It is well-established that the reach of section 271(a) is limited to infringing activities that occur within the United States."). In order for Simatelex to be found liable for direct infringement, therefore, Wing Shing must point to evidence that Simatelex made, used, offered to sell or sold a patented invention *within* the United States or imported a patented invention *into* the United States. It is not disputed that Simatelex made the

accused coffeemakers in China, and Wing Shing does not allege any "use" by Simatelex. Instead, Wing Shing argues that Simatelex directly infringed the Design Patent within the United States in three ways. The first two forms of alleged direct infringement—selling *within* the United States and importing *into* the United States—are premised on the single contention that, as a result of certain language in Simatelex's invoices, title of the goods did not pass until unconditional payment for the goods had been made, and, in turn, that unconditional payment frequently was not remitted until after the merchandise had arrived in the United States. Wing Shing argues that in such cases, a sale was made within the United States because title passed when the merchandise was on American soil, and the infringing goods were imported into the United States because Simatelex owned the goods when they were brought into the country. Because whether a sale or importation occurred in the United States will turn on the same analysis, the Court will resolve both issues in its discussion of whether there has been an infringing sale within the meaning of § 271(a), *infra*. As its third theory of direct liability, Wing Shing posits that Simatelex made an "offer to sell" infringing products in the United States. In support of this argument, Wing Shing cites only the Supply Agreement's governing law provision that states the Agreement was "deemed" executed in Florida.

### A.       Was there a "sale" within the United States?

Simatelex claims, and Wing Shing concedes (setting aside for the moment the language added to Simatelex's invoices), that under the unmodified terms of the Supply Agreement Simatelex "sold" the coffeemakers it manufactured to Sunbeam in Hong Kong for purposes of 271(a) liability when it delivered the goods to the ocean carrier in Hong Kong. (Tr. 27:22–28:15, Oct. 27, 2006; *see also* Pl.'s Opp'n Mem. 10 ("If

Simatelex had sold the coffeemakers FCA Hong Kong, without adding a term concerning title to 197 of its invoices, Simatelex could properly argue that it did not sell the coffeemakers in the United States.").)  Wing Shing, however, argues that because Sunbeam did not object when Simatelex began unilaterally to insert new language ("Title of the goods shall not pass until unconditional payment of the goods") into its invoices, title thereafter passed at the time Sunbeam remitted its payment to Bank One, rendering the situs of sale the location of the coffeemakers at that point in time.  Simatelex responds that the newly added invoice language was legally inoperative in light of the restrictive clause in the Supply Agreement prohibiting modification or amendment other than by written agreement signed by both parties.  As such, and relying primarily on the Supply Agreement's FCA Hong Kong term, Simatelex argues that the relevant situs is Hong Kong because that is the location where its obligations under the Supply Agreement were fully "performed."

　　　　Despite the parties' agreement that the point at which legal title passes under the terms of the relevant contract is outcome determinative, it is not readily apparent that this point, as determined by applicable state law, in fact controls for purposes of determining whether a sale has been made within the United States under § 271(a).  *See, e.g.*, *Cybiotronics, Ltd. v. Golden Source Elec., Ltd.*, 130 F. Supp. 2d 1152, 1168 n.41 (C.D. Cal. 2002) ("The Federal Circuit has stated (in a quite distinguishable context, but still an instructive statement) that, at least for purposes of personal jurisdiction, the meaning of the patent infringement statutes is controlled by federal law, not state contract law.") (citing *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998)).  The appropriate starting point, of course, is the language of the statute itself.  *See Dewsnup v.*

*Timm*, 502 U.S. 410, 434 (1992).  Section 271(a), however, does not define the term

"sells."  In considering how to interpret the term, the Federal Circuit has looked to the

ordinary meaning of the term "sale," including its dictionary meaning.  *In re NTP, Inc. v.*

*Research in Motion, Ltd.*, 418 F.3d 1282, 1314–15 (Fed. Cir. 2005) ("In our

interpretation of the statute, we 'give words of a statute their ordinary, contemporary,

common meaning, absent an indication Congress intended them to bear some different

import.'  We begin with the words of the statute, but may consult dictionaries and

legislative history if necessary to construe the statute." (internal citations omitted)).  "The

definition of 'sale' is: '1. The transfer of property or title for a price. 2. The agreement by

which such a transfer takes place. The four elements are (1) parties competent to contract,

(2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid

or promised.'"  *Id.* at 1319 (quoting *Black's Law Dictionary* 1337 (7th ed. 1999)); *see*

*also Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1382 (Fed. Cir. 1998)

(considering the meaning of the term "sale" under section 3378 of the Tariff Act of 1930,

19 U.S.C. § 1337, and looking to dictionaries and the U.C.C. as "useful, though not

authoritative" in determining the term's ordinary meaning in the absence of a definition

in the statute); *Merriam-Webster's Collegiate Dictionary* 1097 (11th ed. 2003) (defining

"sale" as "the act of selling; *specif*: the transfer of ownership of and title to property from

one person to another for a price").  While the "ordinary" meaning of the term "sale"

does not immediately answer the question of *where* a sale occurs, it is evident that the

passage of title is at least relevant to the inquiry.  It is not, however, dispositive.

In *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576

(Fed. Cir. 1994), the Federal Circuit considered, in the context of determining whether

personal jurisdiction could be established under the Illinois long-arm statute,[7] where, as a matter of federal law, an infringing "sale" was made:

> [T]he character of the particular tort [of patent infringement] alleged here requires a look back to federal law on the conceptualization of the tort and its situs. The difficulty in answering this question is that unlike the "making" and the "using" of an infringing article, which as purely physical occurrences are relatively straightforward to place, the "selling" of an infringing article has both a physical and a conceptual dimension to it. That is to say, it is possible to define the situs of the tort of infringement-by-sale either in real terms as including the location of the seller and the buyer and perhaps the points along the shipment route in between, or in formal terms as the single point at which some legally operative act took place, such as the place where the sales transaction would be deemed to have occurred as a matter of commercial law.

*Id.* at 1579. The court held "that to sell an infringing article to a buyer in Illinois is to commit a tort there (though not necessarily only there). To hold otherwise would exalt form over substance in an area where the Supreme Court generally has cautioned against such an approach." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79 (1985)). In so holding, the Federal Circuit specifically rejected the argument that, for a jurisdictional analysis, the situs of the tort of patent infringement could be determined exclusively by the "FOB" terms pursuant to which the accused products were delivered, and queried whether in lieu of mechanically looking to the place where legal title passes, the determination ought to be made by reference to the "more familiar places of contracting and performance." *Id.* at 1579–80.

In *MEMC Electronic Materials, Inc.*, the Federal Circuit addressed whether "an actual sale" took place within the United States and concluded that "the sale occurred *in Japan* where all of the essential activities took place." 420 F.3d at 1377 (emphasis in

---

[7] Specifically, the court considered whether, for purposes of satisfying the "commission of a tortious act" element of the Illinois long-arm statute, the tortious acts (selling an infringing article) upon which the suit was based were "committed" in Illinois. 35 F.3d at 1579.

original).  In so ruling, the Federal Circuit found the plaintiff's reliance upon *North American Philips* and *Beverly Hills Fan Co.* misplaced, because the plaintiff could not show any "contracting and performance"—i.e., the "essential activities"—by the defendant in the United States. *Id.* at 1579–80.  *See also, e.g.*, *SEB, S.A. v. Montgomery Ward & Co., Inc.*, 412 F. Supp. 2d 336, 341–43 (S.D.N.Y. 2006) (rejecting F.O.B. China designation as determinative of actual location of sale in case where there was evidence defendant's agent had participated in negotiations and meetings in the United States); *Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. GmbH*, No. C 01-01391, 2002 U.S. Dist. LEXIS 23050, at *22–*23 & n.13 (N.D. Cal. Sept. 5, 2002) (rejecting argument that F.O.B. freight terms controlled situs of sale in face of express and conclusive admission by defendant that infringing products had been sold (and offered for sale) within the United States); *Cybiotronics*, 130 F. Supp. 2d at 1173 (that title passed "FOB Hong Kong" not determinative; however sale took place in Hong Kong because all "essential activities"—negotiation, execution, performance, and delivery— took place there).

    While the foregoing cases make clear that the place where "title" passed is not outcome determinative, the Court will consider this factor as one of the several 'essential activities' to be examined in determining whether, as a matter of federal law, Simatelex sold infringing coffeemakers within the United States.  Because the Supply Agreement is a contract for the sale of goods containing a choice-of-law provision agreeing that Delaware law shall apply, the Delaware Uniform Commercial Code is the appropriate law to consult in construing its terms.  *See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1532 (Fed. Cir. 1993) ("State law . . . controls in matters of contract law and

interpretation."); *Schiavone Constr. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir.

1996) (finding that New York law recognizes and enforces contractual choice of law

provisions); *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162–63 (2d

Cir. 1998) (federal choice-of-law rules accord significant weight to a choice of law

provision in a contract); *Techton American, Inc. v. GP Chemicals, Inc.*, No. Civ.A. 04C-

05-271CLS, 2004 WL 2419129, at *2 (Del. Super. Ct. Oct. 25, 2004) (contract for sale of

goods controlled by the provisions of the Uniform Commercial Code (citing Del. Code

Ann. tit. 6 § 2-102)); (*see also* Pl.'s Opp'n Mem. 6–8 (construing provision of Uniform

Commercial Code); Def.'s Reply Mem. 19–20 (relying on Delaware Uniform

Commercial Code provisions to define term "sale")).  The Supply Agreement does not

expressly state at what point title to the coffeemakers would pass from Simatelex to

Sunbeam.  Under applicable Delaware law, in the absence of an express agreement,

> title passes to the buyer at the time and place at which the seller completes
> his performance with reference to the physical delivery of the goods,
> despite any reservation of a security interest and even though a document
> of title is to be delivered at a different time or place; and in particular and
> despite any reservation of a security interest by the bill of lading if (a) the
> contract requires or authorizes the seller to send the goods to the buyer but
> does not require him to deliver them at destination, title passes to the
> buyer at the time and place of shipment; but (b) if the contract requires
> delivery at destination, title passes on tender there.

Del. Code Ann. tit. 6 § 2-401(a)–(b) (2005).  Therefore, because the Supply Agreement

required delivery FCA to Hong Kong, under the unmodified terms of the Supply

Agreement the "sale" of coffeemakers by Simatelex to Sunbeam occurred in Hong Kong

when Simatelex tendered the merchandise there.  (*See* Tr. 27:22–28:15.)

The question then becomes whether Simatelex's insertion of the sentence "Title

of the goods shall not pass until unconditional payment of the goods" into 197 of their

invoices to Sunbeam modified the terms of the Supply Agreement, such that the passage of title of a particular shipment of coffeemakers occurred at whatever point Sunbeam in fact paid on the relevant invoice.  While the parties have cited no relevant law on the issue, defendant invokes the provision in the Supply Agreement that prevents its modification in the absence of a written agreement signed by the parties.  There is no dispute that Sunbeam and Simatelex did not execute a written amendment to the terms of the Supply Agreement.  Under the Delaware U.C.C., "a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded."  Del. Code Ann. tit. 6 § 2-209(2).  As such, the insertion of the new language into Simatelex's invoices was legally inoperative, and Hong Kong, therefore, is the place where title to the infringing coffeemakers passed as a matter of commercial law.

Plaintiff, having relied solely on its theory that a sale occurred in the United states because title passed after the coffeemakers were on American soil, does not point to any evidence that Simatelex engaged in any other "essential activities" in the United States. It is undisputed, however, that all communications between Simatelex and Sunbeam prior to entering into the Supply Agreement occurred in Hong Kong, and that it was physically executed by executives of Simatelex and Sunbeam in Hong Kong.  Furthermore, performance under the contract was completed upon Simatelex's delivery of the goods to the port in Hong Kong or China.  Wing Shing argues that performance was not completed until some later point in time, due to additional obligations under the Supply Agreement,[8] or because Sunbeam still had to pay the collecting bank and present the original bill of

---

[8] Though Wing Shing does not point specifically to ongoing obligations after the delivery of units to the port, the Supply Agreement does provide that Simatelex shall warrant the units for a period of eighteen months from the date of manufacture, and bear the cost of any defect (Supply Agreement Part I, ¶ 12), and that Simatelex will make available replacement assemblies and/or parts to Sunbeam for a period of seven years from the date of last delivery of units (id. Part I, ¶ 14).

lading to the carrier prior to taking possession of the goods.  (*See* Pl.'s Response to Def.'s Suppl. Rule 56.1 Statement 3–4.)  But of ultimate relevance is whether there was any activity *by Simatelex* in the United States that could rationally be construed as performance under the contract, such that it would be appropriate to deem Simatelex's sale of coffeemakers to Sunbeam as having occurred in the United States.  Plaintiff can point to no activity by Simatelex that occurred in the United States, let alone activities essential to the execution of the sale of the infringing coffeemakers to Sunbeam.  The absence of any such activity, combined with the fact that under the terms of the Supply Agreement the sale occurred upon passage of title in Hong Kong, leads the Court to conclude, as a matter of law, that Simatelex did not make any "sale" of infringing goods within the United States.  For much the same reason, the Court also concludes that Simatelex did not "import" infringing goods into the United States.  Sunbeam was the actual importer and the fact that Simatelex had knowledge that Sunbeam was importing allegedly infringing goods into the United States does not create liability under section 271(a).  *Cybiotronics*, 130 F. Supp. 2d at 175–76.  Accordingly, plaintiff's claims for direct infringement based on the sale or importation of infringing goods are dismissed.

### B.    Was there an "offer to sell" in the United States?

The remaining basis for section 271(a) liability—the claim that Simatelex made an "offer to sell" infringing goods within the United States—requires plaintiff to show that the activities constituting the unlawful "offer" occured within the United States.  *See Rotec*, 215 F.3d at 1251 (defendant's activities in the United States must be sufficient to constitute an offer to sell).  Plaintiff can point to no activity preceding Simatelex and Sunbeam's entry into the Supply Agreement that occurred within the United States.  The

Agreement was negotiated and executed entirely in Hong Kong, and any offer made by Simatelex to Sunbeam was certainly done outside the United States. Under the case law, these facts are dispositive. *See id.* Plaintiff's sole proffered basis for arguing that there has been an offer to sell in the United States is its claims that (1) the Supply Agreement constitutes an offer to sell and (2) by its terms, the Agreement is deemed to have been made in Florida. (*See* Supply Agreement Part II, ¶ 31 ("This Agreement shall be deemed to have been made in Boca Raton, Palm Beach County, Florida, U.S.A.").) As a result, plaintiff argues, the offer to sell embodied by the Supply Agreement was made in Florida. The Court disagrees. Even assuming arguendo that the Supply Agreement in fact constitutes an "offer to sell," rather than the formation of a contract created when an offer to sell was accepted,[9] or alternatively, an "offer to *buy*" made by Sunbeam, any such offer did not take place in the United States. To conclude that the Supply Agreement's deemed-executed provision renders a defendant's activities United States–based for purposes of imposing liability for patent infringement under § 271(a) "would be to exalt form over substance." *3D Sys.*, 160 F.3d at 1379. The Supply Agreement's governing law provision serves only the commonplace contractual purposes of creating jurisdiction in Florida for purposes of adjudicating any disagreements that might arise between the contracting parties and selecting the applicable governing law. It cannot be read to render wholly extraterritorial conduct territorial and, thereby, create "offer to sell" liability under § 271(a). *Cf. North Am. Philips*, 35 F.3d at 1579 (looking beyond "mechanical" test of where legal title passed to consider where contract was formed and performed in determining where sale occurred for purposes of § 271(a)).

---

[9] *Cf.* 1-2 *Corbin on Contracts* § 2.18 (explaining that acceptance of an offer forms a contract, and extinguishes the offeror's power of revocation or withdrawal; implicit in this is a formal distinction between an offer, as such, and a contract).

Even if the "deemed executed" clause did render the Supply Agreement a United States–based offer, it is the Court's view that plaintiff's "offer to sell" theory of liability must then fail because the sales contemplated by the offer to sell ultimately embodied in the Supply Agreement were intended to occur outside the United States, and indeed did occur outside the United States. *See* discussion *supra*. The question of whether liability under § 271(a) extends to offers to sell that do not contemplate actual sales of goods within the United States has not been squarely answered by the Federal Circuit. In *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, the majority opinion did not reach the issue, but its detailed analysis could be construed as a tacit conclusion that a U.S. offer contemplating an otherwise nonactionable foreign sale could violate § 271(a). Indeed, Judge Newman, concurring in *Rotec*, disagreed with the majority opinion to the extent that it tacitly endorsed the "critical premise that an 'offer to sell' made in the United States can constitute patent infringement even when the contemplated sale could not infringe the patent." *Id.* at 1258 (Newman, J. concurring). Since *Rotec*, district courts have disagreed as to this aspect of "offer to sell" liability. *Compare Cybiotronics*, 130 F. Supp. 2d at 1170 ("*Even if* what [defendant] did in this case could credibly be described as an 'offer to sell,' and *even if* that 'offer to sell' could credibly be said to have been made 'within the United States,' liability under Section 271(a) does not extend to 'offers to sell' which do not contemplate actual 'sales' of goods to be consummated within the United States."), *and Synaptic Pharmaceuticals, Corp. v. MDS Panlabs, Inc.*, 265 F. Supp. 2d 452, 462 (D.N.J. 2002) (following *Cybiotronics*), *with SEB*, 412 F. Supp. 2d at 342 n.6 ("If this Court required that both the offer to sell and the actual sale of the infringing product take place in the United States, it would make[ ] the 'offer to sell'

language in § 271(a) superfluous."), *and Wesley Jessen Corp. v. Bausch & Lomb, Inc*., 256 F. Supp. 2d 228, 233–34 (D. Del. 2003) ("The geographic location and physical destination of the subject matter of the 'offer' appear to be immaterial to the analysis, so long as the 'offer' was made in the United States.

   Some guidance with respect to the proper interpretation of § 271(a) may be gleaned from § 271(i), added by the same 1994 amendments that made "offers to sell" a basis for § 271(a) liability, which clarifies how, in § 271(a), the phrase "during the term of the patent" modifies "offer to sell."  Thus, § 271(i) provides that an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.  As Judge Newman points out in her concurrence in *Rotec*, § 271(i) can only be read to mean that in order for an offer to sell to infringe under § 271(a), the sale contemplated by the offer "must be of an item that would infringe the United States patent upon the intended sale." *Rotec*, 215 F.3d at 1260.  That is, in addition to the requirement that the offer itself be made "during the term of the patent," *see* 35 U.S.C. § 271(a),[10] the sale contemplated by the offer must also be during the term of the patent.  Reasoning by analogy, then, a prohibited "offer to sell" made within the United States must contemplate a prohibited sale, that is, a sale that would also occur in the United States.  Contrary to the *SEB* court's reasoning, such a reading does not render the addition of the "offer to sell" language to the statute "superfluous," 412 F. Supp. 2d at 342 n.6, as this language creates a cause of action for direct infringement against an offeror whose offer is never accepted or otherwise consummated by an eventual (independently infringing) sale, a cause of action

---

[10] *See, e.g., Beloit Corp. v. Valmet Corp.*, 44 U.S.P.Q.2D (BNA) 1792 (W.D. Wis. 1997) (recognizing that § 271(a) "offer to sell" liability does not reach pre-issuance offers).

that did not exist prior to 1996. Based on the foregoing, the Court joins with those courts that have concluded that in order for a defendant to be found liable under § 271(a) for "offering to sell" an infringing product, the sale contemplated by the unlawful offer must be intended to occur in the United States, creating an alternate basis for dismissing plaintiff's claim for "offer to sell" liability.

## IV.    Liability for Inducing Infringement under 35 U.S.C. § 271(b)

Section § 271(b) provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). In order to establish a claim for inducing infringement, "the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials Inc*, 420 F.3d at 1378; *see also Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 667 (Fed. Cir.), *cert. denied*, 488 U.S. 968 (1988) ("Thus, a person infringes by actively and knowingly aiding and abetting another's direct infringement. Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement." (citations omitted)). Wing Shing has carried its summary judgment burden with respect to the first required showing, direct infringement, as Sunbeam's infringement of the Design Patent has been established. *In re AI Realty Marketing of N.Y., Inc.*, 293 B.R. 596 (S.D.N.Y. Bankr. 2003), *aff'd in relevant part sub nom. Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378 (S.D.N.Y. 2004), *aff'd*, 153 F. App'x 703 (Fed. Cir. Aug. 24, 2005), *cert. denied*, 126 S. Ct. 1085 (2006). It is undisputed that Simatelex manufactured coffeemakers for Sunbeam, the resale of which within the United States constituted direct infringement. *Id.*

The second showing, defendant's knowing inducement of the direct infringement, requires the establishment of two elements; namely, some affirmative act by defendant that induced the direct infringement, and that defendant acted with the requisite state of mind. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553–54 (Fed. Cir. 1990). Taking the easier element first, the Federal Circuit has recently clarified the intent element of the analysis. In *DSU Medical Corporation v. JMS Co.*, the court held that "the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause the direct infringement." 471 F.3d 1293, 1306 (Fed. Cir. 2006). "Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* (citing *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005); *Manville*, 917 F.2d at 553). Specifically, the intent element is satisfied by a showing that defendant "knew or should have known his actions would induce actual infringements." *Manville*, 917 F.2d at 553. In proving such knowledge, "direct evidence is not required; rather, circumstantial will suffice." *DSU Med. Corp.*, 471 F.3d at 1306 (quoting *Water Techs.*, 850 F.2d at 668); *see also Liquid Dynamics Corp. v. Vaughn Co, Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("A patentee may prove . . . inducement of infringement by either direct or circumstantial evidence." (citation omitted)).

Under this standard, Wing Shing must show that Simatelex knew or should have known that (1) the goods it was manufacturing infringed on Wing Shing's patent and (2) the goods were headed for the United States. Simatelex knew of Wing Shing's patent at

least at the time this lawsuit was filed on February 9, 2001, and all the primarily

infringing sales at issue in this litigation post-date the filing of the complaint.  Simatelex

has presented no evidence that it obtained a plausible noninfringement opinion from

patent counsel that the shipment of its products into the United States would not

constitute infringement.  The only evidence in the record is that Simatelex asked

Sunbeam, its purchaser, about the lawsuit and Sunbeam assuaged its concerns.  (*See* Tr.

14:25–15:8, Oct. 27, 2006.)  Even if the opinion of patent counsel as to noninfringement

raises a genuine issue of material fact as to whether defendant knew or should have

known his products were infringing, the unsupported opinion of a purchaser with an

interest in continuing to receive goods clearly does not.  *See SEB*, 412 F. Supp. 2d at 345

("a defendant can be found liable under § 271(b) even when it asserts that it relied in

good faith on the opinion of counsel").  A manufacturer, in the face of a lawsuit for

patent infringement, cannot satisfy its burden to assure it is not producing infringing

goods merely by asking its purchaser.

        Because there is no genuine issue that Simatelex knew its products infringed on

the Design Patent, the intent element is satisfied so long as Simatelex knew that some of

the infringing products were destined for the United States.  According to the terms of the

Supply Agreement, Simatelex agreed to manufacture the coffeemakers in accordance

with United States law requirements that, according to plaintiff, ensure the salability of

the product in the United States.[11]  Defendant offers no evidence suggesting it did not

know goods it provided to Sunbeam were headed to the United States.  Therefore, there is

---

[11] Specifically, the Supply Agreement included provisions requiring Simatelex to manufacture the coffeemakers in compliance with applicable Underwriters' Laboratories and applicable Food and Drug Administration regulations "for Units to be sold in the United States" (Supply Agreement Part I, ¶ 1), the Clean Air Act Amendments of 1990 (*id.* Part II, ¶ 19), and the United States Fair Labor Standards Act (*id.* Part II, ¶ 20).

no genuine issue of material fact that Simatelex knew that its customer would be selling infringing products in the United States, and the Court finds Wing Shing has established the intent element as a matter of law.

Returning to the first element, Wing Shing must establish that Simatelex took affirmative steps to induce direct infringement by Sunbeam. It has been established that Simatelex manufactured and sold an infringing product outside the United States. The two closely connected questions that arise are (1) can acts of inducement that take place entirely outside the United States create a basis for liability under § 271(b); and, if so, (2) is the act of manufacture and sale of infringing goods abroad sufficient to establish active inducement, or is additional activity required to show inducement?

As to the first question, the Court has located no authority which limits the application of § 271(b) to acts of inducement occurring in the United States. On the other hand, numerous courts have held that, in contrast to §§ 271(a) and (c), § 271(b) applies to exclusively extraterritorial conduct. *See, e.g.*, *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, No. C 01-4925, 2006 WL 463525, at *7 (N.D. Cal. Feb. 24, 2006) ("Unlike direct and contributory infringement, which require an offer or sale within the United States, extraterritorial activity that induces infringement is prohibited by § 271(b)." (citing *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001)); *Playskool, Inc. v. Famus Corp.*, 212 U.S.P.Q. (BNA) 8, 13–14 (S.D.N.Y. 1981); *Kearns v. Wood Motors, Inc.*, 204 U.S.P.Q. (BNA) 485, 489 (E.D. Mich. 1979); *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1141 (7th Cir. 1975); *Hauni Werke Koerber & Co., Kg. v. Molins, Ltd.*, 183 U.S.P.Q. (BNA) 168, 170 (E.D. Va. 1974); *Engineered Sports Products v. Brunswick Corp.*, 362

F. Supp. 722, 727 (D. Utah 1973); Donald S. Chisum, 5-16 *Chisum on Patents* § 16.05(e).

The Federal Circuit has not directly addressed the extraterritorial application of § 271(b), although the district court in *MEMC* cited to a Federal Circuit decision, *Crystal Semiconductor*, in support of the proposition.  2006 WL 463525, at *7.  The Federal Circuit also cited, somewhat ambiguously, to *Crystal Semiconductor* when it declined to definitively address "whether [extraterritorial] inducing activity . . . can give rise to liability under the United States patent laws."  *MEMC Elec. Materials, Inc.*, 420 F.3d at 1379.  However, it is far from clear whether *Crystal Semiconductor* even implicitly stands for this proposition; in that case, the defendant's activities upon which the affirmed jury's verdict of inducement was based may not have been entirely extraterritorial.  Significantly, the defendant found liable for inducement under § 271(b), Tritech Microelectronics International, Inc., was "a company with facilities in Singapore and California."  *Crystal Semiconductor Corp.*, 246 F.3d at 1344.[12]  While the infringing computer chips were manufactured in Singapore and sold abroad, thereby precluding liability under § 271(a), it seems likely that there were domestic activities in California directly connected to the foreign manufacture and sale of the chips that would give rise to inducement liability even if § 271(b) did not apply extraterritorially.  That being said, the Federal Circuit recently quoted a jury charge that provided: "Unlike direct infringement, which must take place within the United States, induced infringement does not require any activity by the indirect infringer in this country, as long as the direct infringement occurs here."  *DSU Med. Corp.*, 471 F.3d at 1305.  While the en banc panel did not

---

[12] By virtue of the style of incorporation, Tritech appears to be a U.S. entity.  Tritech's sister corporation and a co-defendant, Tritech Microelectronics International, PTE Ltd., appears to be a non-U.S. entity.  *Id.*

expressly approve of this statement, it seems unlikely that the court would have quoted it without qualification had there been a serious question as to the extraterritorial reach of § 271(b).[13]

Having concluded that purely extraterritorial acts can give rise to liability, the Court must next determine whether the acts of manufacture and sale of infringing products, without more, constitute active inducement or whether additional acts are required. This question only presents itself in cases, such as the present one, where (i) manufacture and sale are the only suspect acts, and (ii) those acts are extraterritorial. Were they not wholly extraterritorial, of course, a defendant would be liable for direct infringement under § 271(a). Courts have interpreted acts of inducement exceedingly broadly, despite being modified by the term "active." *See Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1378–79 (Fed. Cir. 2001) ("'Actively inducing,' like 'facilitating,' requires an affirmative act of some kind: Of course inducement has connotations of active steps knowingly taken—knowingly at least in the sense of purposeful, intentional as distinguished from accidental or inadvertent. But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent."); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675 (Fed. Cir. 1990) ("A person *induces* infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." (citing *Water Techs.*, 850 F.2d at 669)). The model jury instructions are likewise expansive:

---

[13] *But see* Nicholas Oros, *Infringement Twice Removed: Inducement of Patent Infringement for Overseas Manufacture of Infringing Products Imported by Another*, 10 Comp. L. Rev & Tech. J. 163, 190 (2006) ("[T]he Federal Circuit should avoid extending inducement of infringement liability overseas.").

> Plaintiff asserts that defendant induced patent infringement.  Plaintiff must
> prove four things by the more probable than not standard.  First, defendant
> encouraged or instructed another person how to use a product or perform a
> process in a manner that you, the jury, find infringes the patent.  Second,
> defendant knew of the patent.  Third, defendant knew or should have
> known that his or her encouragement or instructions would likely result in
> the other person doing that which you find to be an infringement of the
> patent.  Fourth, the other person infringed the patent.

Fed. Cir. Bar Assoc., Model Patent Jury Instructions, 8.12.1 Inducing Patent

Infringement, at 48 (2004), *available at* http://www.fedcirbar.org/documents/

forms (brackets and blank spaces omitted).

These definitions and instructions may extend beyond an average person's

understanding of the term "active inducement."  However, the production and sale of an

infringing product knowing that the buyer will sell the product in the United States fit

comfortably within this expanded definition of inducement as "encouragement" or

"aiding and abetting."  While courts have almost always considered factors beyond the

manufacture and sale of infringing products, this Court is now confronted with the

question because there are no meaningful additional factors[14] to support a finding of

inducement should manufacture and sale be insufficient.  Finding no authority for

limiting the application of § 271(b), the Court holds that the manufacture and sale of a

patented product are by themselves sufficient to constitute active inducement under

§ 271(b).[15]  It is undisputed that Simatelex manufactured and sold infringing products

---

[14] Wing Shing argues that additional factors are found in provisions in the Supply Agreement whereby
Simatelex: (1) agreed to manufacture the coffeemakers in accordance with United States law requirements,
(2) agreed to replace defective units and bear the cost of replacement, and (3) agreed to supply replacement
assemblies or parts to Sunbeam upon request.  (Supply Agreement Part I ¶ 12, Part II ¶ 16b.  The Court
disagrees.  The first clause establishes nothing more than that Simatelex was aware goods were going to the
United States. The second and third clause are merely incidental to manufacturing and sale, likely to be
found whenever and wherever those primary activities occur.

[15] This holding does not improperly expand the territorial reach of § 271(a) by creating liability for
manufacturing and selling patented products abroad.  Rather, § 271(b) both requires direct infringement in
the United States *and* affirmative intent to cause such direct infringement; therefore, not every act of

with the knowledge that they would be sold in the United States. Thus, Wing Shing is

entitled to summary judgment on its inducement claim.

## CONCLUSION

Consistent with the foregoing, defendant's motion to dismiss for lack of personal

jurisdiction and motion for summary judgment are DENIED. Plaintiff's motion for

summary judgment is GRANTED as to liability for inducement under § 271(b).


SO ORDERED.

Dated: New York, New York
       March 29, 2007

 

Richard J. Holwell
United States District Judge

---

foreign manufacture and sale (not actionable under § 271(a)) will give rise to liability under § 271(b). *See* Oros, *supra*, at 183 (strict intent requirement would "serve as a significant limitation on the extraterritorial reach of United States patent laws").

36